**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF WISCONSIN**

| | |
|---|---|
| Danny Holloway and James Kohlhagen, on behalf of themselves and all others similarly situated, | Civil Action No.: |
| Plaintiffs, | |
| v. | |
| Kohler Co. and the Kohler Co. Pension Plan, | |
| Defendants. | CLASS ACTION |

Plaintiffs Danny Holloway and James Kohlhagen, by and through their undersigned attorneys, on behalf of themselves and all others similarly situated, state and allege matters pertaining to themselves and their own acts, upon personal knowledge, and as to all other matters, upon information and belief, based upon the investigation undertaken by their counsel, as follows:

## I.   INTRODUCTION

1.      This is a case about Kohler unlawfully shortchanging participants of the Kohler Co. Pension Plan (the "**Plan**") by millions of dollars through their use of outdated mortality tables in violation of the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, et seq. ("ERISA"). By using outdated mortality tables to calculate joint and survivor annuities and preretirement survivor annuities prior to January 1, 2021, Kohler Co. ("**Kohler**") harmed the financial security of its former employees and their loved ones, to its financial gain.

2.      Kohler had a fiduciary duty to act loyally and "solely in the interest of the participants and beneficiaries[,]" the duty to act with "care, skill, prudence, and diligence." ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1).  Kohler disregarded that duty, electing to use unreasonable

and outdated formulas for determining certain types of pension benefits prior to 2021 that substantially underpaid participants of the Plan for Kohler's own financial gain.

3. Plaintiffs bring this class action against Kohler and the Plan (collectively, "**Defendants**") for violations of ERISA's actuarial equivalence requirements.

4. Plaintiffs and the Class (as defined below) are vested participants in the Plan, which deprives them of monies to which they are entitled. Specifically, Plaintiffs and Class Members are retired employees of Kohler and its subsidiaries (and their beneficiaries) who began receiving pension benefits prior to 2021 in the form of a joint and survivor annuity or a preretirement survivor annuity.

5. Kohler was aware of the outdated actuarial assumptions used to calculate these types of benefits and failed to update the formulas sooner or amend the Plan so the updated formulas would be applied retroactively. By using outdated formulas to calculate benefits prior to 2021, Kohler caused Plaintiffs and Class Members to receive less than the "actuarial equivalent" of their vested benefits, in violation of ERISA's actuarial equivalence requirements.

6. Kohler sponsors the Plan, under which participants earn pension benefits in the form of a single life annuity ("**SLA**"). An SLA is a monthly benefit for the life of the participant. However, participants can elect to receive their pension benefits in forms other than an SLA, such as a certain and life annuity or a joint and survivor annuity ("**JSA**").

7. For married participants the default form of pension payment is a JSA, which provides retirees with a monthly annuity for their lives and, when they die, a contingent annuity for the life of their spouse or beneficiary. *See* 29 U.S.C. § 1055(a). Plans label JSAs as a percentage of the benefit paid during the beneficiary's life. A 50% JSA pays the spouse half the amount the retiree received each month; a 75% JSA pays the spouse three-quarters of what the retiree received

2

each month; a 100% JSA pays the beneficiary the same amount the retiree received. Unless they choose otherwise and obtain their spouses' consent, participants who are married when their benefits commence automatically receive a 50% JSA.

8.      To convert an SLA to a JSA, the Plan uses formulas based on actuarial assumptions — consisting of interest rates and mortality tables — to determine the amount by which it reduces a participant's SLA to arrive at the monthly JSA benefit amount. A JSA recipient's monthly amount will generally be less than the amount he or she would receive as an SLA because pension plans must account for paying benefits for two lives (the retiree and his or her beneficiary) rather than one. This case concerns how Kohler unlawfully reduced the SLA for participants receiving certain types of benefits prior to 2021 to arrive at the monthly benefit amount.

9.      ERISA requires that JSA benefits that pay between 50% to 100% (also known as "Qualified Joint and Survivor Annuities" or "**QJSAs**") be at least the "actuarial equivalent" of the retiree's SLA. *See* 29 U.S.C. § 1055(d); *see also* § 1055(e) (discussing the qualified preretirement survivor annuity ("**QPSA**") and how benefits must not be less than the amount which would be payable as a survivor annuity under a QJSA).

10.     Two benefit forms are actuarially equivalent when the present values of the two benefits are the same, based on reasonable actuarial assumptions. Calculating present value requires interest rates and mortality tables. Interest rates discount the value of expected future payments to the date of the calculation. Because of the time value of money, a dollar today is worth more than a dollar in the future because that dollar can be invested today and earn interest. As a result, to calculate the value of a benefit stream one must use a rate to discount the future payments to today's dollars. Mortality tables predict the rate at which retirees will die at any given age and, therefore, the chance they will receive an additional year of benefits. The interest rate and mortality

3

table work together to generate a "conversion factor" that is applied to a participant's SLA. Once applied, the conversion factor reduces the SLA to arrive at an alternate benefit form. Together, the actuarial assumptions used in the formula directly impact the conversion factor.

11. For the last several decades, mortality rates have improved. Generally, retirees today live longer than retirees from the 1960s and 1970s. Accordingly, mortality tables based on data from the 1960s and 1970s predict that people will die earlier than contemporary mortality tables. All else being equal, using an antiquated mortality table to calculate a conversion factor decreases the present value of an optional benefit form and, in turn, the monthly amount retirees receive. For example, a plan using a mortality table from the 1970s to calculate a 50% JSA — interest rates being equal — may produce a conversion factor of 0.90. In this scenario, a participant entitled to a monthly SLA benefit of $1,000 would receive $900 per month as a 50% JSA (his or her spouse would receive $450 per month). By contrast, a plan using a mortality table from 2022 — interest rates being equal — may produce a conversion factor of 0.93. The same retiree would receive $930 per month as a 50% JSA (his or her spouse would receive $465 per month).

12. When plans make actuarial conversions from one benefit form to another or from normal retirement age to early retirement, ERISA's actuarial equivalence requirements apply. These statutory requirements, along with the associated Treasury regulations, ensure that, all else being equal, the forms of pension benefit that a retiree receives, and the time they receive those benefits relative to their normal retirement age, are *at least* as valuable as the SLA they would receive at normal retirement age. *See* ERISA §§ 205(d) and (e) and 204(c)(3), 29 U.S.C. §§ 1055(d) and (e) and 1054(c)(3); 26 C.F.R. § 1.401(a)-20, Q&A 16. ERISA's actuarial equivalence requirements are designed to ensure that married participants receiving JSAs and early retirees are not penalized for their choices, regardless of the optional form they select or when they retire.

4

13. ERISA § 204(c)(3) requires that an employee's accrued benefit, if it "is to be determined as an amount other than an annual benefit commencing at normal retirement age . . . shall be the actuarial equivalent of such benefit[.]" 29 U.S.C. § 1054(c)(3). Failing to provide a participant with at least the actuarial equivalence of his or her vested benefit results in an illegal forfeiture in violation of ERISA § 203(a), 29 U.S.C. § 1053(a).

14. Kohler violated ERISA's actuarial equivalence requirements by using antiquated actuarial assumptions to calculate pre-2021 QJSAs and QPSAs, which produced unreasonably low conversion factors and, therefore, depressed the value of these benefits. Despite the considerable increases in life expectancy over the past 50 years, Kohler continued to use antiquated actuarial assumptions to calculate pension benefits for participants until 2021. For most Plan participants that began collecting JSAs and QPSAs prior to 2021, Defendants determined the amount of their benefits based on formulas that use the 1971 Group Annuity Mortality table ("**71 GAM**") — which is based on data from the 1960s — weighted 90% male and 10% female. Coupled with a 6% interest rate, the 71 GAM produces conversion factors that are consistently lower than the conversion factors produced by contemporary actuarial assumptions, which Defendants now use to calculate these types of benefits. As a result, participants who began receiving benefits prior to 2021 in the form of a JSA or QPSA receive less than they would if Defendants used current and reasonable actuarial assumptions.

15. After years of using the same outdated assumptions to calculate QJSAs and QPSAs, Kohler updated the Plan's formulas for calculating these types of benefits in 2020. Starting on January 1, 2021, participants who began receiving QJSAs or QPSAs had their benefits determined by the higher of two options. These options include the outdated assumptions described above (i.e., the 71 GAM with a 6% interest rate) or the contemporary, reasonable assumptions released by the

Department of Treasury (the "Treasury") in August preceding the Plan year in which benefits are paid.

16.     Defendants' use of outdated formulas, based on unreasonable actuarial assumptions to calculate the benefits of participants prior to 2021, violated ERISA's actuarial equivalence requirements and resulted in Plaintiffs and the Class receiving less than they would if Defendants used the reasonable and current assumptions that they now apply to determine QJSA and QPSA benefits.

17.     The damage caused by Defendants' unlawful use of formulas based on unreasonable actuarial assumptions to calculate pre-2021 JSA and QPSA benefits has negatively affected and will continue to negatively affect Plaintiffs and Class Members for the rest of their lives (and the lives of their spouses too).

18.     Plaintiffs bring this action on behalf of a Class of participants receiving JSAs between 50% and 100%, and QPSA recipients who began receiving benefits before 2021, pursuant to ERISA § 502(a)(2) and (a)(3), 29 U.S.C. §§ 1132(a)(2) and (a)(3). Plaintiffs seek all appropriate equitable relief, including but not limited to a declaration that the Plan's pre-2021 formulas for determining JSAs and QPSAs violate ERISA's actuarial equivalence and non-forfeitability requirements; an injunction requiring Kohler to ensure that the Plan pays actuarially equivalent benefits to all Class members during the relevant time period; an Order from the Court requiring Defendants to pay all amounts improperly withheld in the past and that they will withhold in the future; an Order requiring Defendants to recalculate Plaintiffs' and the Class's JSA and QPSA benefits in accordance with ERISA's actuarial equivalence requirement; an Order requiring Defendants to increase the amounts of Plaintiffs' and the Class's future benefit payments, and any other relief the Court determines to be just and equitable.

6

## II.   <u>JURISDICTION AND VENUE</u>

19.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for Federal jurisdiction of actions brought under Title I of ERISA.

20.     This Court has personal jurisdiction over Kohler because it is headquartered in, transacts business in, employs people in, and has significant contacts with this District, and because ERISA provides nationwide service of process.

21.     This Court has personal jurisdiction over the Plan because it offers and pays pension benefits to participants and beneficiaries in this District, and because ERISA provides nationwide service of process.

22.     Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because Defendants may be found in this District, Defendants employed Plaintiffs Kohlhagen and Holloway and other Class members in this District, and otherwise does business in this District.

## III.   <u>PARTIES</u>

23.     Plaintiff Danny Holloway resides in Brownwood, Texas and is a Participant in the Plan. He worked for Kohler for approximately 40 years. His benefits, which Defendants calculated using the Plan's unlawful formula, began on September 1, 2019. Mr. Holloway elected the 50% JSA offered by the Plan as a "Qualified" JSA with his wife as the beneficiary.

24.     Plaintiff James Kohlhagen resides in Sheboygan Falls, Wisconsin and is a Participant in the Plan. He worked for Kohler for approximately 42 years. His benefits, which Defendants calculated using the Plan's unlawful formula, began on October 1, 2020. Mr.

7

Kohlhagen elected the 100% JSA offered by the Plan as a "Qualified" JSA with his wife as the beneficiary.

25. Kohler is a privately held American manufacturing company that produces plumbing and kitchen and bath products, engines and power generation systems, cabinetry, and home interiors, and has several hotels. Kohler is the "plan sponsor" for the Plan within the meaning of § 3(16)(B), 29 U.S.C. § 1002(16)(B). Kohler is also the Plan's "administrator" within the meaning of ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A).

26. The Plan is a defined benefit plan within the meaning of ERISA § 3(35), 29 U.S.C. § 1002(35). The Plan is joined as a nominal defendant pursuant to Rule 19(a) of the Federal Rules of Civil Procedure solely to assure that complete relief can be granted. Pursuant to 29 U.S.C. § 1102, the Plan was established and maintained pursuant to a written instrument known as a "Plan Document."

## IV. BACKGROUND

### A. *Actuarial Equivalence Under ERISA*

27. Actuarial equivalence is a "term of art" (*Stephens v. US Airways Group, Inc.*, 644 F.3d 437, 440 (D.C. Cir. 2011)), which "Congress intended [] to have its established meaning." *McDermott Int'l, Inc. v. Wilander*, 498 U.S. 337, 342 (1991). If "Congress has used technical words or terms of art, it is proper to explain them by reference to the art or science to which they are appropriate." *Corning Glass Works v. Brennan*, 417 U.S. 188, 201 (1974) (citations omitted). "And so, it makes sense that when the 'appropriate methodology' for calculating an actuarially-equivalent value 'is not apparent from the face of the definition of actuarial equivalence, nor from the statute or regulations as in effect,' courts look 'to practice within the field of actuarial science.'" *Adams v. U.S. Bancorp*, No. 22-cv-509, 2022 U.S. Dist. LEXIS 188713, at *16 (D. Minn. Oct. 17,

2022) citing *Pizza Pro Equip. Leasing v. Comm'r*, 147 T.C. 394, 412 (2016), *aff'd*, 719 F. App'x 540 (8th Cir. 2018).

28.     At the heart of actuarial equivalence calculations is the concept of "***present value***." Actuarial equivalence describes two benefit streams as having equal present values. As the Court of Appeal for the D.C. Circuit explained: "Two modes of payment are actuarially equivalent when their ***present values*** are ***equal*** under a given set of assumptions." *Stephens*, 644 F.3d at 440 (emphasis added) (citing Jeff L. Schwartzmann & Ralph Garfield, Education and Examination Comm. of the Society of Actuaries, Actuarially Equivalent Benefits 1, EA1-24-91 (1991) ("Schwartzmann & Garfield"). Relying on the Society of Actuary's definition of actuarially equivalent benefits, the *Stephens* court instructed that "within the actuarial field, 'actuarial equivalen[ce]' is understood to require a present-value calculation." *Adams*, No. 22-cv-509, 2022 U.S. Dist. LEXIS 188713, at *16 citing *Stephens*, 644 F.3d at 440.

29.     Present value is the value of a payment stream, on a specific measurement date, that is adjusted for the time value of money. The Society of Actuaries[1] defines the "Present Value" of a cash flow as the "value of a future cash flow given by a present value model under a particular set of assumptions about ***future economic or other conditions*** . . . ."[2]  In other words, present value is the amount that you would need to invest today at a given interest rate over a specified period in order to have an amount at the end of that period equal to a future amount.

_____

[1] The Society of Actuaries ("SOA") is a global professional organization for actuaries founded in 1949 that provides the exams, certifications, and continuing education necessary to practice as an actuary in the U.S.

[2]     (Emphasis     added),     *see*     Society     of     Actuaries,     Glossary.     Available     at: https://www.soa.org/4a537f/globalassets/assets/files/edu/actuarial-glossary.pdf     (last     accessed May 22, 2023).

30.     Like the Society of Actuaries, ERISA defines "present value" as "the value adjusted to reflect ***anticipated events***." ERISA § 3(27), 29 U.S.C. § 1002(27). Such adjustments, the definition continues, "shall conform to such regulations as the Secretary of the Treasury may prescribe." *Id.*

31.     Calculating present value requires two primary ingredients: (1) an interest rate and (2) a mortality table. An interest rate discounts future dollars to the present. The rate is often called a "discount rate" because money available now is worth more than the same amount in the future — because it can be invested and earn interest. *Berger v. Xerox Corp. Retirement Income Guar. Plan*, 338 F.3d 755, 759 (7th Cir. 2003). ("A discount rate is simply an interest rate used to shrink a future value to its present equivalent."). A mortality table shows the rate of deaths occurring during a selected time interval and predicts the likelihood of death in an individual within the current year.[3]  Using discount rates and mortality tables, an actuary can determine whether two benefit forms (e.g., an SLA and JSA) are actuarially equivalent by comparing the present values.

32.     ERISA's actuarial equivalence requirements help ensure that pension plan participants receive at least the same value of monthly benefit regardless of the benefit form. The notion is that a participant should not be penalized for selecting one form of pension benefit over another.

33.     Under ERISA, defined benefit plans must offer at least two payment options: one for married participants (i.e., JSAs) and one for unmarried participants (i.e., SLAs). However, a JSA could pay out for longer because plans make payments to the participant and, potentially, the beneficiary. Therefore, if the monthly payment to the participant remains the same, a JSA will be more expensive than an SLA because the beneficiary may also receive payments.

---

[3] *See* Society of Actuaries, definition of "Mortality" *supra* note 2.

34. To account for the additional value from a JSA, plan sponsors reduce the participant's SLA or the monthly amount he or she will receive. Plans use formulas based on actuarial assumptions to determine the amount of the reduction to the SLA. The actuarial assumptions generate a conversion factor that is applied to the SLA to determine the reduction in benefits to arrive at the JSA amount. To ensure plans do not shortchange participants and their beneficiaries on their JSA benefits, Congress required that JSAs be at least "actuarial[ly] equivalent" to the SLAs offered to non-married participants. *See* 29 U.S.C. § 1055(d); *see also* 26 U.S.C. § 417 (same requirement under the Tax Code). Accordingly, actuarial equivalence should be cost-neutral, whereby the "cost" to the plan should be the same regardless of the benefit the participant selects.

35. ERISA's actuarial equivalence requirements impose duties on pension plans in form and timing. *See Esden v. Bank of Bos.*, 229 F.3d 154, 163 (2d Cir. 2000) ("What these provisions [ERISA's actuarial equivalence provisions] mean in less technical language is that: (1) the accrued benefit under a defined benefit plan must be valued in terms of the annuity that it will yield at normal retirement age; and (2) if the benefit is paid at ***any other time*** (e.g., on termination rather than retirement) or in ***any other form*** (e.g., a lump sum distribution, instead of annuity) it must be worth at least as much as that annuity.") (Emphasis added.).

36. With regards to the ***form*** of pension benefit, ERISA requires that qualified JSAs ("QJSAs") be at least the actuarial equivalent of the value of the SLA offered to the retiree at the times benefits commence. 29 U.S.C. § 1055(d)(1). The Tax Code repeats this definition at 26 U.S.C. § 417(b)(2) (defining QJSA as "the actuarial equivalent of a single annuity for the life of the participant") and § 417(g)(2) (defining QJSA as "the actuarial equivalent of a single annuity

for the life of the participant").[4] A plan can offer multiple QJSAs ranging from 50% to 100%. 29 U.S.C. § 1055(d)(1).

37.     A plan must designate one of the QJSAs as the default option for married participants, which can be more valuable than the other QJSAs offered (26 C.F.R.§ 1.401(a)-20, Q&A 16) but must be *at least* the actuarial equivalent of the SLA (29 U.S.C. § 1055(d)(1)). If the plan offers optional forms of benefit that are more valuable than the SLA, then the default QJSA must be of at least equal value to that benefit form. *See* 26 C.F.R. § 1.401(a)-20, Q&A 16. That way, married and unmarried participants have at least one form of benefit available to them that is equivalent to the most valuable benefit form.

38.     Under ERISA, plans must also offer a QPSA. *See* ERISA § 205(a)(2), 29 U.S.C. § 1055(a)(2). A QPSA is an annuity paid to the participant's surviving spouse if the participant dies before his or her benefits commence. *See* ERISA § 205(e), 29 U.S.C. § 1055(e). A QPSA must be at least the actuarial equivalent of the amount the spouse would have received if the participant had selected the plan's default QJSA and died. ERISA § 205(e)(1)(A), 29 U.S.C. § 1055(e)(1)(A).

39.     With regards to the ***time*** a retiree opts to start receiving benefits, ERISA requires that "if an employee's accrued benefit is to be determined as an amount other than an annual benefit commencing at normal retirement age . . . the employee's accrued benefit . . . shall be the actuarial equivalent of such benefit[.]" § 204(c)(3), 29 U.S.C. § 1054(c)(3). ERISA defines "normal retirement age" as age 65, or younger if provided by the pension plan. ERISA § 3(24), 29 U.S.C. § 1002(24); *see also* 26 U.S.C. § 411(a)(8); Treas. Reg. § 1.411(a)–7(b). In other words, if a

---

[4] The Internal Revenue Code (the "Tax Code") has parallel provisions for ERISA's actuarial equivalence requirements, and the Treasury regulations provide further guidance into the rules. *See* 26 U.S.C. §§ 417(b)(2), 411(c)(3); *see also* 26 C.F.R. § 1.411(c)-1(e) (referring to the "actuarial equivalence" of the participant's accrued benefit in conformance with Treasury regulations).

participant chooses to begin receiving benefits prior to the "normal retirement age," the benefit must be at least the actuarial equivalent of the amount the retiree would have received as an SLA at the normal retirement age.

40. ERISA § 203(a), 29 U.S.C. § 1053(a), provides that an employee's right to the vested portion of his or her normal retirement benefit is nonforfeitable. The Treasury regulation which "defines the term 'nonforfeitable' for purposes of these [non-forfeitability] requirements," 26 C.F.R. § 1.411(a)-4(a), states that "adjustments in excess of reasonable actuarial reductions, can result in rights being forfeitable." Therefore, distributions of retirement benefits that are less than their actuarial equivalent value constitute an impermissible forfeiture under ERISA § 203(a), 29 U.S.C. § 1053(a).

### B. Actuarial Equivalence Requires Reasonable Assumptions

41. Reasonable assumptions must underlie the actuarial computation of present value to achieve equivalence.[5] As discussed above, ERISA defines "present value" as "the value adjusted to reflect *anticipated events*. Such adjustments, the definition continues, "shall conform to such regulations as the Secretary of the Treasury may prescribe." *Id.* (emphasis added.)

42. The Treasury regulations repeatedly reference using reasonable assumptions when performing actuarial equivalence calculations. For example, the Treasury regulation concerning QJSAs provides that "[e]quivalence may be determined, on the basis of consistently applied *reasonable actuarial factors*, for each participant or for all participants or reasonable groupings of participants." 26 C.F.R. § 1.401(a)-11(b)(2) (emphasis added). Likewise, the Treasury

---

[5] "To be equivalent means to be 'equal in force, amount, or value.' [Definition of] *Equivalent*, Merriam-Webster, https://www.merriam-webster.com/dictionary/equivalent. Only accurate and *reasonable actuarial assumptions* can convert benefits from one form to another in a way that results in equal value between the two." *Urlaub v. CITGO Petro. Corp.*, Docket No. 21 C 4133, 2022 US Dist. LEXIS 30616, at *19–20 (ND Ill. Feb. 22, 2022).

regulation discussing protected accrued benefits defines "[a]ctuarial present value" as meaning "determined using ***reasonable actuarial assumptions***." 26 C.F.R. §1.411(d)-3(g)(1) (emphasis added). Further, when making actuarial reductions to determine the early retirement benefits of terminated vested participants — which 29 U.S.C. § 1056(a)(3) governs — the corresponding Treasury regulations instruct plans to use "reasonable actuarial assumptions." 26 C.F.R. § 1.401(a)-14(c)(2). It "would be strange for the [Treasury] Commissioner to provide greater protection to participants who were terminated before reaching minimum early-retirement age rather than those who are active." *Adams*, 2022 US Dist. LEXIS 188713, at *21.

43.    There is also a reasonableness requirement for lump-sum distributions. Indeed, within the context of cash balance plans, the regulations require optional forms of benefit to be actuarially equivalent "using reasonable actuarial assumptions." 26 C.F.R. § 1.411(a)(13)-1(b)(3). When comparing optional forms of benefits to a QJSA, plans must use either the "applicable" mortality table and interest rates, which are "considered reasonable actuarial assumptions," or specify their own "reasonable interest rate and reasonable mortality table." 26 C.F.R. §§ 1.417(a)(3)-1(c)(2)(iv)(A)–(B) and (f)(ii)(2)(i)(A)–(B). As the court in *Adams* stated: "***A reasonableness requirement is consistent with ERISA's structure and purpose***." *Adams*, No. 22-cv-509, 2022 US Dist. LEXIS 188713, at *21 (emphasis in original).

44.    The American Academy of Actuaries (the "Academy"), a professional organization that represents and unites actuaries in all practice areas, similarly requires using reasonable actuarial assumptions. In 1988, the Academy created the Actuarial Standards Board ("ASB"), which promulgates standards of practice for the entire profession in the United States. The ASB issues actuarial standards of practice ("**ASOPs**") that discuss how each demographic (i.e.,

14

mortality) and economic (i.e., interest rate) assumption that an actuary selects must be reasonable. *See* ASOP Nos. 35 and 27.

45.     The ASOPs, published by the ASB, dictate that "each economic assumption used by an actuary should be reasonable." *See* ASOP 27, para. 3.6. An assumption is "reasonable" if it "reflects the actuary's professional judgment," "takes into account historical and current economic data that is relevant as of the ***measurement date***," and "reflects the actuary's estimate of future experience." *Id.* (emphasis in original).

46.     ASOP 35, discussing Demographic and Other Noneconomic Assumptions, explains that an actuary "should select reasonable demographic assumptions in light of the particular characteristics of the defined benefit plan that is the subject of measurement."[6] Para. 3.3.5 — titled "Select a Reasonable Assumption" — echoes this idea and states that an assumption is reasonable if it "reflects the actuary's professional judgment," "takes into account historical and current demographic data that is relevant as of the ***measurement date***," and "reflects the actuary's estimate of future experience." *Id.* (emphasis in original).

47.     Courts have also signaled that plans should use reasonable actuarial assumptions to calculate pension benefits. *See Smith v. Rockwell Automation, Inc.*, 438 F. Sup. 3d 912, 921 (E.D. Wis. 2020) ("plans must use the kind of actuarial assumptions that a reasonable actuary would use at the time of the benefit determination"); *Masten v. Metropolitan Life Ins. Co. Empl. Bens. Committee*, 543 F. Sup. 3d 25, 33 (S.D.N.Y. 2021) ("the Court finds it plausible that the Plan's use of decades-old mortality tables is not a 'reasonable' actuarial assumption in light of the ready availability of updated alternatives . . . the Court concludes that ***ERISA requires that Plan***

---

[6] *See* ASOP 35, Section 3 Analysis of Issues and Recommended Practices. Available at: https://www.actuarialstandardsboard.org/asops/selection-of-demographic-and-other-noneconomic-assumptions-for-measuring-pension-obligations/ (last accessed September 6, 2023).

***administrators use reasonable actuarial assumptions when converting SLAs into alternative benefits***" (emphasis added); *Urlaub,* 2022 US Dist. LEXIS 30616, at \*19 ("it cannot possibly be the case that ERISA's actuarial equivalence requirements allow the use of unreasonable mortality assumptions"); *Dooley v. Am. Airlines, Inc.*, No. 81-C-6770, 1993 US Dist. LEXIS 15667, 1993 WL 460849, at \*11 (N.D. Ill. Nov. 4, 1993) ("The term 'actuarially equivalent' means ***equal in value*** to the present value of normal retirement benefits, determined on the basis of actuarial assumptions with respect to mortality and interest which are ***reasonable*** . . . .") (emphasis added).

48.     The assumptions pension plans use to determine actuarial equivalence are not reasonable simply by being expressed in the plan document. *See Laurent v. Pricewaterhouse Coopers LLP*, 794 F.3d 272, 286 (2d Cir. 2015) ("ERISA did not leave plans free to choose their own methodology for determining the actuarial equivalent of the accrued benefit"); *Esden*, 229 F.3d at 164 ("If plans were free to determine their own assumptions and methodology, they could effectively eviscerate the protections provided by ERISA's requirement of 'actuarial equivalence'").

## V.     FACTUAL ALLEGATIONS

### A.  The Plan

49.     Kohler established the Plan effective January 1, 1975, which is an "employee pension benefit plan" within the meaning of ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A), and a "defined benefit plan" within the meaning of ERISA § 3(35), 29 U.S.C. § 1002(35).

50.     All Participants in the Plan are current or former employees of Kohler and its subsidiaries or affiliates.[7] Based on data from the most recently filed public documents, the Plan

---

[7] Generally, to become a participant in the Plan, an employee must be a regular full-time employee who is age 21 and has completed 1,000 hours during a 12-month period following employment. However, there are several exceptions to become a participant, none of which apply to this case.

has 7,244 participants and beneficiaries receiving payments from the Plan; there are 8,432 active participants as of January 1, 2021. *See* Form 5500 for the Plan (2021).

51. The Plan is administered by Kohler.

52. The Plan consists of several sub-parts that are divided into Supplements based on prior versions of the Plan and other defined benefit plans that merged into the Plan over the past couple of decades. The Plan has the following six Supplements labelled A through F: (1) Supplement A - Administrative Associates; (2) Supplement B – Kohler, WI Factory Hourly Associates; (3) Supplement C – Spartanburg Factory Hourly Associates; (4) Supplement D – Brownwood Factory Hourly Associates; (5) Supplement E – Sterling Hourly Associates; and (6) Supplement F – Kohler Interiors Furniture Company Hourly Associates. In addition, Supplements A, E, and F have Appendices with provisions that come into effect for those participants as per their respective Appendices depending on where the participant worked. While the Plan has six Supplements and Appendices, some of which contain variations in the provisions applicable to the participants in each respective Supplement and Appendix, the Plan "including the Supplements and Appendices, is intended to be a 'single plan' . . ." Kohler Co. Plan Document, § 9.10.

53. Under the Plan, participants earn a pension in the form of an SLA that begins at age 65.[8] Benefits are calculated based on a participant's years of benefit service and the benefit level in effect at the time of retirement.[9] The Plan provides that the normal form of benefit for unmarried

---

[8] *See id.,* §§ 2.1(a) (defining "Accrued Benefit" as a participant's benefit as of any date "which is payable as a single life annuity at Normal Retirement Age . . . .") and 2.1(x) (defining "Normal Retirement Age" as "attainment of age sixty-five (65) and when five years of Vesting Service has been completed . . . .").

[9] The exception is for participants who were manufacturing associates at the Brownwood, Texas location who contributed 2% of their basic annual earnings to the Plan until January 1, 2017. Those participants, which includes Plaintiff Holloway, have their benefits calculated by adding their pre-2017 contributions multiplied by 5.542% plus their post-2017 benefits multiplied by a set dollar

17

participants is an SLA.[10] For married participants, the normal form of benefit is a 50% JSA. *Id.* The Plan also provides participants with other QJSA benefit forms including a 75% and 100% JSA as well as a 10-year certain and life annuity. *Id.*, § 5.8.

54.    Additionally, the Plan provides for a death benefit for participants who die after attaining five years of service but before they begin receiving benefits. *Id.* § 5.5. The Plan computes death benefits as if the employee retired on the day before death and are paid as a 50% JSA. *Id.*, § 5.5(c).

55.    The Plan has several different formulas to convert a participant's Accrued Benefit to a JSA. The core Plan used the 71 GAM, weighted 90% male and 10% female and a 6% interest rate to calculate these types of benefits until January 1, 2021. *Id.*, § 2.1(b). For lump sum benefits, which are available only to participants Accrued Benefits of $5,000 or less, the core Plan uses the applicable interest rate and applicable mortality table for the November preceding the Plan Year in which the distribution would occur.[11] Effective January 1, 2021, Kohler amended the Plan's definition of "Actuarial Equivalent" to use the applicable interest rate for the August preceding the Plan Year in which the annuity would begin and the applicable mortality table for the Plan Year in

---

amount depending on their years of service. While the formula for calculating the participant's accrued benefit differs slightly for these participants, the Plan used the same formulas to convert the participant's Accrued Benefit to a JSA.

[10] *Id.*, § 5.6 (defining "Normal Form of Payment" as a single life annuity for unmarried participants and an "Actuarial[ly] Equivalent" QJSA.).

[11] *Id.*; *see also id,* § 5.10.

which the annuity would begin.[12]  Kohler also updated the definitions of "Actuarial Equivalent" for several of the Appendices and Supplements.[13]

### B. The Plan's Pre-2021 QJSAs and QPSAs Do Not Satisfy ERISA's Actuarial Equivalence Requirements

56.     As discussed, up until 2021, the core Plan used formulas based on the following assumptions to determine participants' JSA and QPSA benefits: 71 GAM, weighted 90% male and 10% female and a 6% interest rate. Those Supplements and Appendices that used different formulas, similarly used outdated mortality tables including the 71 GAM and the UP-84.

57.     The Plan's formulas for calculating JSAs and QPSAs prior to 2021 did not reflect the economic conditions or the mortality rates of participants when Defendants calculated Plaintiffs' and the Class's benefits. The use of antiquated interest rates and mortality tables is unreasonable and unlawful under ERISA.

---

[12] *See* Amendment No. 6 to the Plan.

[13] The amended definitions are uniform to the extent they updated the formulas to use the applicable interest rate from the August prior to the Plan Year during which the annuity begins and the applicable mortality table for the Plan Year in which the annuity begins. Prior to the amendment, the following Appendices and Supplements used these formulas:
-   Supplement A, Appendix A-4, Morgantown: 8.5% and the UP-84 table;
-   Supplement E, Appendix E-1, Sheriden: 7.5% and the 71 GAM;
-   Supplement E, Appendix E-2, Huntsville: 10% and the UP-84;
-   Supplement E, Appendix E-4, Malvern: 10% and the UP-84;
-   Supplement E, Appendix E-5, Searcy: 6% and the 71 GAM (100% male with a 6-year setback for the joint annuitant);
-   Supplement E, Appendix E-6, Morgantown: 8.5% and the UP-84; and
-   Supplement F: tabular factors that appear to be based on 6% and the UP-84 (weighted 90% male and 10% female mortality).

19

### C. The Formulas Used To Determine Actuarial Equivalence Must Be Reasonable When The Benefits Are Calculated

#### i. Reasonable Discount Rates

58.     The Treasury is a reliable source for a "reasonable" discount rate for any given year. The Treasury regularly updates the discount rate, known as the "applicable interest rate." According to the Treasury, pension plans should use discount rates that reflect the actuary's "best estimate," anticipated future events, and economic data as of the measurement date. The "applicable interest rate" is based on corporate bond yields and is updated throughout the year.

59.     The applicable interest rate is a yield curve. Yield curves provide for different rates depending on when future payments are made. The applicable interest rate is based on the first, second, and third Segment Rates. *See* 26 U.S.C. §§ 417(e)(3)(C) and 430(h)(2)(C). The Segment Rates are determined using yields on corporate bonds with maturities of 0 to 5 years, 5 to 20 years, and beyond 20 years. The Segment Rates are appropriate benchmarks for pension plans because the maturity rates closely correspond to the time period over which a pension plan will pay its retirees. The following shows the IRS Segment Rates over the past five years:

| Year | 417(e) Segment Rates for August | Effective Rate |
|------|----------------------------------|----------------|
| 2022 | 3.79% / 4.62% / 4.69% | 4.36% |
| 2021 | 0.66% / 2.50% / 3.12% | 2.09% |
| 2020 | 0.52% / 2.22% / 3.03% | 1.92% |
| 2019 | 2.09% / 3.00% / 3.61% | 2.90% |
| 2018 | 3.10% / 4.15% / 4.46% | 3.90% |
| 2017 | 1.93% / 3.57% / 4.36% | 3.28% |

60.     Defined benefit plans use the "applicable interest rate" to calculate the present values of lump sum benefits. Section 417(e) of the Tax Code provides that a pension plan can offer a lump sum benefit. However, the present value of the lump sum must be at least equal to the present value calculated using the "applicable mortality table" and "applicable interest rate" (collectively referred to as the "**Treasury Assumptions**"). *See* 26 U.S.C. § 417(e)(3). While a plan

20

can subsidize a lump sum benefit, the applicable interest rate (coupled with the applicable mortality table) sets a "floor" for the present value below which a lump sum cannot go.

61.     Indeed, for providing the relative value of all benefit forms, including JSAs, the applicable interest rate is *per se* reasonable for actuarial equivalence purposes. *See* 26 C.F.R. § 1.417(a)(3)-1 (c)(2)(iv)(B).

### ii.     *Reasonable Mortality Tables*

62.     Mortality tables show the probability of death for a specific group of individuals or population groups. Pension Plans use mortality tables to estimate the probability of a participant dying before they receive another year of benefits. Mortality is a key assumption in determining benefits and liabilities that should represent the "best estimate" of the expected duration of future benefit payments.

63.     Mortality tables for pension plans should be updated regularly to reflect changes in life expectancy. Indeed, "plan management should consider the specific demographics of their plan when evaluating the appropriate mortality or other assumptions to use, as well as relevant available mortality data. . . . *[management] should consider any published new mortality data for their plans in relation to their plan-specific mortality experience and future expectations*."[14]

64.     Several organizations publish mortality tables used by pension plans, but the primary source is the SOA. The Retirement Plan Experience Committee ("RPEC") of the SOA publishes the mortality tables upon which many pension plans across the country rely. The SOA

---

[14] (Emphasis added) PWC, US Pensions Guide, Defined benefit plan financial statements, § 9.4.4, June 30, 2022. Available at: https://viewpoint.pwc.com/dt/us/en/pwc/accounting_guides/pensions-and-employee-benefitspeb/peb_guide/Chapter-9-PEB/94_Defined_benefit_plan_financial_statements_8.html (last accessed September 6, 2023).

bases its mortality tables on "experience studies" that measure the actual mortality experience of pension plan participants in the United States.

65. These "experience studies" were the basis for the mortality tables published by the SOA in 1971 ("**71 GAM**"), 1976 (the "**UP-84**"), 1983 (the "**1983 GAM**"), 1994 (the "**1994 GAR**"), 2000 (the "**RP-2000**"), 2014 ("**RP-2014**") and 2019 (the "**Pri-2012**"). Periodically, the tables are updated to account for changes in the mortality experience of US workers over the years. The SOA typically publishes new mortality tables or sets of tables several years after the date they are named after. For example, the SOA released the RP-2000 mortality tables in 2000 based on the mortality experience of pension plan participants from 1990–1994.

66. For the past 50 years, the SOA's experience studies show a steady upward trend in life expectancy. Generally, retirees in the last 15 years live longer than retirees in the 1970s and 1980s. A study that the SOA published in 2014 indicated that the RP-2000 mortality tables "no longer reflect the actual mortality experience of pension plan participants and projected trends in that experience."[15] When the SOA released the RP-2014 mortality tables, the managing director for the SOA predicted that the update would increase liabilities for pension plans between 4% and 8%.[16] The increase in liabilities spurred Moody's to conclude that plan sponsors would have to divert $110 billion to their pension plans over seven years to fund additional liabilities.[17] The chart

---

[15] Mortality Tables for Determining Present Value Under Defined Benefit Pension Plans, 26 C.F.R. 1, 82 FR 46388, 46397.

[16] *See* Society of Actuaries Pledges Faster Mortality Scale Updates, available at: https://www.plansponsor.com/society-of-actuaries-pledges-faster-mortality-scale-updates/ (last accessed May 31, 2023)

[17] *Id.*

below shows the increase in life expectancy over the last few decades and the corresponding impact on plan liabilities:



*See* Plaintiff's Expert Report, *Rockwell v. Berube*, No. 20-cv-01783, ECF No. 55-5 at 18.

67.    As the graph above demonstrates, a 70-year-old today is expected to live roughly 30% longer than a 70-year-old retiree in the 1980s. It is improper for a pension plan to use a 50-year-old mortality table to calculate a retiree's benefits in 2019 because antiquated mortality assumptions fail to account for the improvements in life expectancy over the past few decades. For example, the 71 GAM was released in 1971. Data collected from 1964–1968, now **over 50 years old**, form the basis of the 71 GAM. In the last 50 years, there have been substantial improvements in lifestyle habits and healthcare, which lowered the mortality rates of pensioners. The 71 GAM does not account for these improvements. Nevertheless, pension plans, like the Plan, continued to use the 71 GAM to calculate benefits for participants until just over two years ago.

68.     A benchmark for reasonable mortality rates is the mortality assumption released by the Treasury. Like discount rates, the Treasury also releases the "applicable mortality table," based on the most up-to-date SOA mortality tables. When prescribing the applicable mortality tables, the Secretary must consider the "results of available independent studies of mortality of individuals covered by pension plans." *Id.* In other words, the IRS defers to the SOA when it comes to the mortality rates of pensioners.

69.     Plan sponsors must make minimum contributions to their pension plans, and the Treasury prescribes the tables that plans should use. For plan years beginning on or after January 1, 2023, the Treasury regulations prescribe the use of mortality tables based on the Pri-2012 Report,[18] which is based on RPEC's experience study for the period 2005–2014 and is the best available study of the actual mortality experience of participants.[19] The "applicable mortality table" must be updated (at least every ten years, but, in practice, the Treasury updates the rates more frequently) and "must be based on the actual experience of pension plans . . . ." 26 U.S.C. § 430(h)(3)(A).

70.     For measuring pension plan liabilities, plan sponsors can apply to use plan-specific mortality tables that more accurately reflect the experience of a given plan's participants. *See* 26 U.S.C. § 430(h)(3)(C). If a plan has enough participants and has been around long enough, it can apply to the IRS to use company-specific mortality tables based on the experience of the plan's participants to determine present values under § 430. Similarly, plans can use separate mortality tables for disabled participants because disabled participants generally have different mortality rates from healthy pensioners. *See* 26 U.S.C. § 430(h)(3)(D). Like the plan-specific tables,

---

[18] *See* IRS Notice 2022-22; *see also* 87 FR 25161, 25163.

[19] *See* 87 FR 25161, 25163.

mortality tables used for disabled participants must be periodically updated. Through its regulatory guidance, the Treasury believes that it is important to regularly update mortality tables used by pension plans to ensure that they are accurate and reflect the latest mortality trends.

71.     As discussed, the Treasury Assumptions, including the applicable mortality table, are *per se* reasonable for determining the present values of different benefit forms. *See* 26 C.F.R. § 1.417(a)(3)-1 (c)(2)(iv)(B).

### D. The Plan's Pre-2021 Formulas for Calculating QJSAs and QPSAs Do Not Satisfy ERISA

72.     Until Kohler amended the Plan in late 2020, Defendants employed formulas based on the 71 GAM and the UP-84, along with interest rates ranging from 6% to 10%, to determine participants' JSA and QPSA benefits.

73.     Using these formulas to calculate benefits was unreasonable because the discount rates did not reflect the economic conditions on participants' measurement dates (i.e., the dates Defendants determined their benefits). Similarly, the mortality table did not reflect the experience of participants or pensioners in general, let alone future "anticipated events" (i.e., the anticipated mortality rates of pensioners).

74.     Effective January 1, 2021, the Plan implemented a floor for benefits using the Treasury Assumptions from the prior August.[20] At some point prior to October 16, 2020 — the date Kohler's Senior Vice President - Human Resources, Laura Kohler, executed Amendment No. 6 — Kohler realized that the Plan's formulas were outdated and not producing actuarially

---

[20] *See* Amendment No. 6 to the Plan (2)(C), which states, in relevant part, "the Actuarial Equivalent benefit shall be calculated using whichever of the following produces the greater benefits amount: (i) the Accrued Benefit earned as of December 31, 2020 . . . or (ii) the Accrued Benefit earned as of the Annuity Starting Date . . . ." In other words, if the prior formula produced a greater benefit than the updated formula, the participant would get the higher of the two.

25

equivalent benefits. As a result, Kohler updated the Plan to use reasonable formulas. However, Amendment No. 6 applied to benefits calculated only on or after January 1, 2021. Participants whose benefits were calculated before January 1, 2021, have no recourse. Instead, they must continue receiving benefits produced by outdated and unreasonable formulas that are not actuarially equivalent for the rest of their lives, in violation of ERISA's actuarial equivalence requirements.

75.     Kohler could have made Amendment No. 6 retroactive and recalculated the benefits of those participants who began collecting prior to 2021, but it chose not to. Kohler could have applied a "greater of" provision to ensure that no participant who began receiving benefits prior to 2021 would be worse off, but it chose not to. As a result, a participant who began receiving benefits on December 1, 2020, would receive benefits that were considerably lower than an employee in the same position who began receiving benefits on January 1, 2021, to start benefits. Discovery will reveal whether Kohler notified participants beforehand about its intent to change the formulas used to calculate their benefits.

76.     The unreasonably low conversion factors produced by the pre-2021 formulas based on the 71 GAM and UP-84 result in JSA and QPSA benefits that violate ERISA's actuarial equivalence requirements. The JSA benefits produced using these formulas are not at least actuarially equivalent to the SLA that participants were offered when their benefits started. Accordingly, Plaintiffs and the Class are receiving substantially less each month than they would have if the Plan had made the amendment retroactive.

77.     The conversion factors produced by these outdated formulas are unreasonably low compared to the conversion factors produced using the Plan's current formulas, which are based on updated and reasonable actuarial assumptions. The following chart shows a comparison of the

conversion factors using the Plan's pre-2021 formulas and the Plan's current formulas from the years Plaintiffs began receiving benefits:

| Year | Benefit Form | The Plan's Pre-2021 Conversion Factors | Monthly Amount Using Pre-2021 Conversion Factors | Conversion Factors Produced Using Treasury Assumptions | Monthly Amount Using the Treasury Conversion Factors | Percent Difference in Benefit Amount |
|------|--------------|----------------------------------------|--------------------------------------------------|--------------------------------------------------------|------------------------------------------------------|--------------------------------------|
|      | SLA          | N/A                                    | $1,000.00                                        | N/A                                                    | $1,000.00                                            | N/A                                  |
| 2019 | 50% JSA      | 0.8813                                 | $881.30                                          | 0.9308                                                 | $930.80                                              | **5.31%**                            |
|      | 100% JSA     | 0.7878                                 | $787.80                                          | 0.8705                                                 | $870.50                                              | **9.50%**                            |
| 2022 | 50% JSA      | 0.9145                                 | $914.50                                          | 0.9496                                                 | $949.60                                              | **3.69%**                            |
|      | 100% JSA     | 0.8426                                 | $842.60                                          | 0.9040                                                 | $904.40                                              | **6.79%**                            |

78. The chart above demonstrates that Defendants' use of unreasonable and unlawful assumptions before 2021 resulted in a substantial difference in monthly income.

79. Plaintiff Holloway began collecting benefits under the Plan on September 1, 2019. He accrued and was offered an SLA that would have paid him $1,274.59 per month. He selected the 50% JSA, which pays $1,123.28 per month. If the Plan used the updated formulas to calculate his benefits, Plaintiff Kohlhagen's benefit would be approximately $1,189.39 or $63.11 more per month. By using a formula based on outdated actuarial assumptions that produce unreasonably low conversion factors, instead of reasonable, current actuarial assumptions like the applicable Treasury Assumptions, Defendants reduced the present value of Plaintiff Holloway's benefits by approximately $10,531 (past damages of $3,092.39 and future damages of $7,438.61).

27

80. Plaintiff Kohlhagen began collecting benefits under the Plan on October 1, 2020. He accrued and was offered an SLA that would have paid him $1,764.00 per month. He selected the 100% JSA, which pays $1,482.26 per month. If the Plan used the updated formulas to calculate his benefits, Plaintiff Kohlhagen's benefit would be approximately $1,594.66 or $108.40 more per month. By using a formula based on outdated actuarial assumptions that produce unreasonably low conversion factors, instead of reasonable, current actuarial assumptions like the Plan currently uses, Defendants reduced the present value of Plaintiff Kohlhagen's benefits by approximately $23,354 (past damages of $3,902.40 and future damages of $19,451.60).

81. Defendants updated the formulas used to calculate QJSA and QPSA benefits effective January 1, 2021. Defendants now use formulas based on the § 417(e) Treasury Assumptions[21] to calculate the same types of benefits. Updating the Plan's formulas to calculate QJSAs and QPSAs is indicative of Defendants' recognition of their need to provide actuarially equivalent benefits. By failing to apply the new formulas retroactively, however, Defendants have left participants who started receiving benefits before 2021 with benefits that fall short of ERISA's requirements. This leaves these participants and their beneficiaries with lower benefits than they should be receiving for the rest of their lives.

82. Defendants' use of unreasonable formulas based on outdated actuarial assumptions for calculating pre-2021 benefits results in Plaintiffs and the Class Members receiving significantly less than the total amount of benefits to which they are entitled under ERISA, to Kohler's financial gain.

---

[21] As discussed, the new formulas for calculating benefits is based on the applicable mortality table with the interest rate from August prior to the Plan year during which participants begin receiving benefits

# VI.  CLASS ACTION ALLEGATIONS

83.     Plaintiffs bring this class action pursuant to Rule 23 of the Federal Rules of Civil

Procedure on behalf of themselves and the following class (the "Class"):

> All participants of the Plan who (1) began receiving benefits on or
> after six years prior to the date this Complaint is filed but prior to
> January 1, 2021, (2) are receiving a JSA with a survivor benefit of
> at least 50% and no more than 100% of the benefit paid during the
> participant's life, or are receiving a QPSA, and (3) are receiving a
> benefit where the actuarial present value of their annuity as of the
> date benefits began was less than the actuarial present value of their
> Normal Retirement Age SLA using the Plan's current formulas for
> calculating benefits. Excluded from the Class are Defendants and
> any individuals who are subsequently determined to be fiduciaries
> of the Plans.

84.     The Class members are so numerous that joinder of all members is impractical. The

Class includes hundreds of individuals. Based on government filings, as of January 1, 2021, 7,244

participants and beneficiaries were receiving benefits under the Plan.

85.     Plaintiffs' claims are typical of the Class Members' claims because they arise out

of the same policies and practices as alleged herein, and all Class Members are similarly affected

by Defendants' wrongful conduct. Plaintiffs and all Class Members seek identical remedies under

identical legal theories, and Plaintiffs' claims do not conflict with the interests of any other

members of the Class in that Plaintiffs and the other members of the Class were subject to the same

conduct and suffered the same harm.

86.     There are questions of law and fact common to the Class, which predominate over

questions affecting only individual Class members. Common legal and factual questions include,

but are not limited to:

> A.  Whether the actuarial assumptions used to determine the value of pre-2021
>     JSAs and QPSAs are unreasonable;

B.  Whether the actuarial assumptions used to determine the value of pre-2021 JSAs and QPSAs violate the actuarial equivalence requirements of ERISA;

C.  Which actuarial assumptions would produce a reasonable conversion factor to apply to Plaintiffs' and Class Members' SLA to satisfy ERISA's actuarial equivalence requirements;

D.  Whether the actuarial assumptions used by the Plan to calculate pre-2021 JSA and QPSA benefits caused harm to Plaintiffs and Class Members;

E.  Whether Kohler violated its fiduciary duties of loyalty and prudence under ERISA;

F.  Whether Kohler should be required to recalculate pre-2021 benefits for Plaintiffs and Class Members based on reasonable actuarial assumptions; and

G.  Whether Plaintiffs and the Class should receive additional benefits.

87.  Plaintiffs will fairly and adequately represent the Class because Plaintiffs have no interests antagonistic to those of other members of the Class, and the adjudication of their claims will necessarily decide the identical issues for all other Class Members. Plaintiffs are committed to the vigorous prosecution of this action.

88.  Plaintiffs have retained counsel competent and experienced in ERISA and class action litigation.

89.  Plaintiffs do not anticipate any difficulty in management of this matter as a class action.

90.  The requirements of Rule 23(b)(1)(A) are satisfied because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants.

91.  The requirements of Rule 23(b)(1)(B) are satisfied because prosecution of separate actions by the members of the Class would create a risk of adjudications for individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not

parties to this action, or that would substantially impair or impede their ability to protect their interests.

92.     Class action status is also warranted under Rule 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief for the Class as a whole.

93.     Individual Class Members do not have an interest in controlling the prosecution of these claims in individual actions rather than a class action because the equitable relief sought by any Class Member will either inure to the benefit of the Plan or affect each Class Member equally. If the Class is not certified under Rule 23(b)(1) or (b)(2), then certification under (b)(3) is appropriate because the questions of law or fact common to the members of the Class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy because the damages suffered by each individual Class Member is relatively modest compared to the expense and burden of individual litigation. It would be impracticable for each Class Member to seek redress individually for the wrongful conduct alleged herein. There will be no difficulty in the management of this litigation as a class action as the legal issues affect standardized conduct by Defendants and class actions are commonly used in such circumstances. Furthermore, since joinder of all members is impracticable, a class action will allow for an orderly and expeditious administration of the claims of the Class and will foster economies of time, effort and expense.

31

# VII. CAUSES OF ACTION

## COUNT I: VIOLATION OF ERISA'S JSA
## ACTUARIAL EQUIVALENCE REQUIREMENT
## (ERISA § 205, 29 U.S.C. § 1055)

94. Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint.

95. The Plan improperly reduced pre-2021 JSA and QPSA benefits for participants and their beneficiaries below what they would receive if those benefits satisfied ERISA's actuarial equivalence requirements.

96. ERISA § 205(d), 29 U.S.C. § 1055(d) requires plans to provide QJSAs that are "the actuarial equivalent of a single annuity for the life of the participant." Similarly, the applicable Treasury regulations state that plans must provide QJSAs that are "at least the actuarial equivalent of the normal form of life annuity or, if greater, of any optional form of life annuity offered under the plan . . . determined, on the basis of consistently applied *reasonable actuarial factors*[.]" 26 C.F.R. § 1.401(a)-11(b)(2) (emphasis added).

97. Because the Plan used outdated, unreasonable actuarial assumptions to calculate pre-2021 QJSA and QPSA benefits, the benefits those participants receive (and their beneficiaries receive) are not actuarially equivalent to the SLA Defendants offered them.

98. Defendants' use of unreasonable actuarial assumptions as set forth herein is a violation of ERISA § 205(d), 29 U.S.C. § 1055(d).

99. ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action to: "(A) enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

100.    Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), Plaintiffs seek all available and appropriate remedies to redress violations of ERISA's actuarial equivalence requirements outlined in § 1055(d), including but not limited to the relief set forth below in the Prayer for Relief.

### COUNT II: VIOLATION OF ERISA'S EARLY RETIREMENT ACTUARIAL EQUIVALENCE REQUIREMENT (ERISA § 204, 29 U.S.C. § 1054)

101.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint.

102.    The Plan's pre-2021 formulas for calculating JSA and QPSA benefits are based on outdated, unreasonable actuarial assumptions, which produce monthly benefits that are less than the actuarial equivalent of the participant's SLA at Normal Retirement Age, in violation of ERISA § 204(c)(3), 29 U.S.C. § 1054(c)(3).

103.    ERISA § 204(c)(3), 29 U.S.C. § 1054(c)(3) requires that "if an employee's accrued benefit is to be determined as an amount other than an annual benefit commencing at normal retirement age . . . the employee's accrued benefit . . . shall be the actuarial equivalent of such benefit[.]"

104.    Through the use of formulas based on antiquated and unreasonable actuarial assumptions, Plaintiffs and members of the Class who began receiving pre-2021 JSA and QPSA benefits before Normal Retirement Age had their benefits improperly reduced and are not receiving benefits that are actuarially equivalent to their Normal Retirement Age SLA.

105.    Defendants' use of unreasonable actuarial assumptions as set forth herein is a violation of ERISA at § 204, 29 U.S.C. § 1054.

106.    ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action to: "(A) enjoin any act or practice which violates any provision of this title

33

or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

107.    Pursuant to ERISA §§ 502(a)(3), 29 U.S.C. §§ 1132(a)(3), Plaintiffs seek all available and appropriate remedies to redress violations of ERISA's actuarial equivalence requirements outlined in § 1054(c)(3), including but not limited to the relief set forth below in the Prayer for Relief.

## COUNT III: VIOLATION OF ERISA'S ANTI-FORFEITURE RULES
### (ERISA § 203, 29 U.S.C. § 1053)

108.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint.

109.    The Plan used formulas based on outdated, unreasonable actuarial assumptions, which produced monthly benefits for participants who receive pre-2021 JSAs and QPSAs that are less than the actuarial equivalent of their SLA at Normal Retirement Age, causing an illegal forfeiture of benefits in violation of ERISA 203(a), 29 U.S.C. § 1053(a).

110.    Section § 203(a) of ERISA, 29 U.S.C. § 1053(a) establishes "an employee's right to his normal retirement benefit is non-forfeitable[.]" The applicable Treasury regulation states that "adjustments in excess of reasonable actuarial reductions, can result in rights being forfeitable." 26 C.F.R. § 1.411(a)-4(a).

111.    By using antiquated assumptions, particularly mortality tables based on data that is 50 years old, Defendants underestimated the value of the pre-2021 benefits that participants had accrued, resulting in benefits that are not actuarially equivalent to the SLA at Normal Retirement Age and, therefore, causing an impermissible forfeiture.

112.    Defendants' use of unreasonable actuarial assumptions as set forth herein is a violation of § 203, 29 U.S.C. § 1053.

34

113.     ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action to: "(A) enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

114.     Plaintiffs seek all available and appropriate remedies to redress violations of ERISA's non-forfeitability requirements outlined in § 203(a), 29 U.S.C. § 1053(a), including but not limited to the relief in the Prayer for Relief.

### COUNT IV: BREACHES OF FIDUCIARY DUTY
### (ERISA § 404, 29 U.S.C. § 1104)

115.     Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint.

116.     During all relevant times, Kohler, in addition to acting as the Plan's sponsor, was an acting fiduciary of the Plan and was responsible for paying benefits in accordance with ERISA's requirements and the Plan's terms, unless those Plan terms themselves violated ERISA.

117.     ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), imposes several fiduciary duties on Plan Administrators, including the duty to act loyally and "solely in the interest of the participants and beneficiaries[,]" the duty to act with "care, skill, prudence, and diligence" — which includes ensuring that benefits paid pursuant to a defined benefit plan conform with ERISA's statutory requirements — and the duty to act "in accordance with the documents and instruments governing the plan *insofar as such documents and instruments are consistent with* the provisions of" subchapters I and III of ERISA. 29 U.S.C. § 1104(a)(1) (emphasis added).

118.     Here, Kohler is a fiduciary for the Plan because it exercises discretionary authority or discretionary control respecting the management of the Plan as well as authority and control

35

over the disposition of the Plan's assets. *See* ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Kohler had authority or control over the amount and payment of JSAs and QPSAs from Plan assets.

119.    Kohler breached these fiduciary duties by administering a Plan that did not conform with ERISA's actuarial equivalence requirements. Kohler acted disloyally by causing Plaintiffs and the Class to receive benefits that were not actuarially equivalent to their SLAs at Normal Retirement Age thereby enabling itself, as plan sponsor, to retain additional money by reducing the minimum amount it was required to contribute to the Plan.

120.    Kohler failed to act prudently and diligently by failing to sufficiently review the terms of the Plan, including the formulas used to calculate pre-2021 optional benefit forms and QPSAs. This caused Plaintiffs and the Class to receive less than the full value of their ERISA-protected accrued benefit. Further, Kohler failed to apply the amendment updating the formulas retroactively to shore up the benefits of participants who retired before 2021.

121.    Kohler's breaches as set forth herein caused participants who began receiving benefits prior to 2021 to forfeit a portion of their accrued benefit.

122.    As a direct and proximate result of these fiduciary breaches, Class members lost millions of dollars in vested accrued pension benefits.

123.    ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action to: "(A) enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

124.    Plaintiffs seek all available and appropriate remedies to redress violations of ERISA's fiduciary duties outlined in § 404(a)(1), 29 U.S.C. § 1104(a)(1), including but not limited to the relief set forth below in the Prayer for Relief.

36

## VIII.    <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs pray that judgment be entered against Defendants on all claims and requests that the Court awards the following relief:

A.    An Order certifying this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, appointing Plaintiffs as Class representatives, and appointing the undersigned to act as Class Counsel;

B.    A declaratory judgment that the actuarial assumptions used in the Plan's pre-2021 formulas for determining JSAs and QPSAs violated ERISA's joint and survivor annuity requirements set forth in § 205(d), 29 U.S.C. § 1055(d);

C.    A declaratory judgment that the actuarial assumptions used in the Plan's pre-2021 formulas for determining JSA and QPSA benefits prior to Normal Retirement Age violated ERISA's actuarial equivalence requirement set forth in § 204(c)(3), 29 U.S.C. § 1054(c)(3);

D.    A declaratory judgment that the actuarial assumptions used in the Plan's pre-2021 formulas for determining JSA and QPSA benefits prior to Normal Retirement Age violated ERISA's anti-forfeiture provision at § 203(a), 29 U.S.C. § 1053(a);

E.    A declaratory judgment that Kohler breached its fiduciary duties in violation of ERISA § 404, 29 U.S.C. § 1104 for, *inter alia*, following Plan terms that violated ERISA and for failing to pay benefits to participants who began receiving JSAs or QPSAs before 2021 in conformance with ERISA's actuarial equivalence and anti-forfeiture requirements outlined in §§ 205(d), 204(c)(3), and 203(a), 29 U.S.C. §§ 1055(d), 1054(c)(3), and 1053(a);

37

F.    An Order requiring Defendants to provide an accounting of all prior payments of benefits to the Class under the Plan for which the outdated and unreasonable assumptions discussed herein were used to determine JSAs and QPSAs, and provide information to recalculate those payments to Class members in compliance with ERISA §§ 205(d), 204(c)(3), and 203(a), 29 U.S.C. §§ 1055(d), 1054(c)(3), and 1053(a);

G.    Declaratory and injunctive relief as necessary and appropriate, including enjoining Defendants from further violating the duties, responsibilities, and obligations imposed on them by ERISA with respect to the Plan and ordering Defendants to pay future benefits to participants who began receiving JSA and QPSA benefits before 2021 in accordance with ERISA §§ 205(d), 204(c)(3), and 203(a), 29 U.S.C. §§ 1055(d), 1054(c)(3), and 1053(a);

H.    Disgorgement of any benefits or profits Defendants received or enjoyed due to the violations of ERISA §§ 205(d), 204(c)(3), and 203(a), 29 U.S.C. §§ 1055(d), 1054(c)(3), and 1053(a);

I.    Restitution of all amounts Defendants kept in the Plan but were obliged to pay to Plaintiffs and other Class Members in accordance with ERISA §§ 205(d), 204(c)(3), and 203(a), 29 U.S.C. §§ 1055(d), 1054(c)(3), and 1053(a);

J.    Surcharge from Defendants totaling the amounts owed to participants and/or the amount of unjust enrichment obtained by Defendants as a result of the violations of ERISA §§ 205(d), 204(c)(3), and 203(a), 29 U.S.C. §§ 1055(d), 1054(c)(3), and 1053(a);

K.      Relief to the Plan from Kohler for its violations of ERISA § 404, 29 U.S.C. § 1104, including a declaration that the pre-2021 formulas used to determine JSAs and QPSAs violated ERISA §§ 205(d), 204(c)(3), and 203(a), 29 U.S.C. §§ 1055(d), 1054(c)(3), and 1053(a); restoration of losses to the Plan and its participants caused by Kohler's fiduciary violations; disgorgement of any benefits and profits Kohler received or enjoyed from the use of the Plan's assets or violations of ERISA; surcharge; payment to the Plan of the amounts owed to Class Members caused by fiduciary breach so that those amounts owed can be provided to Plan participants; and all appropriate injunctive relief, such as an order requiring Kohler to pay all participants fully ERISA-compliant benefits and to ensure that all benefits it pays to participants conform to the requirements set forth in ERISA §§ 205(d), 204(c)(3), and 203(a), 29 U.S.C. §§ 1055(d), 1054(c)(3), and 1053(a);

L.      An award of pre-judgment interest on any amounts awarded to Plaintiffs and the Class pursuant to law;

M.      An award of Plaintiffs' attorneys' fees, expenses, and/or taxable costs, as provided by the common fund doctrine, ERISA § 502(g), 29 U.S.C. § 1132(g), and/or other applicable doctrine; and

N.      Any other relief the Court determines is just and proper.

**SIRI & GLIMSTAD LLP**

/s/ *Oren Faircloth*
Oren Faircloth
Lisa R. Considine *(application for admission forthcoming)*

39

745 Fifth Avenue, Suite 500
New York, New York 10151
Tel: (212) 532-1091
Fax: (646) 417-5967
E: ofaircloth@sirillp.com
E: lconsidine@sirillp.com

*Attorneys for Plaintiffs*