UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

DANNY HOLLOWAY, JAMES
KOHLHAGEN, JEFFREY LEFFIN, AND
KEITH PFISTER, on behalf of themselves and
all others similarly situated,

No. 2:23-cv-01242-JPS

PLAINTIFFS,

**AMENDED COMPLAINT
CLASS ACTION**

vs.

KOHLER CO. AND THE KOHLER CO.
PENSION PLAN.

DEFENDANTS.

INTRODUCTION ...........................................................................................................3

JURISDICTION AND VENUE.......................................................................................6

PARTIES ........................................................................................................................7

I.     Plaintiffs.............................................................................................................7

II.    Defendants ........................................................................................................8

APPLICABLE ERISA REQUIREMENTS.....................................................................8

I.     Pension Benefit Options Must Be Actuarially Equivalent ................................8

II.    Reasonable Factors Must Be Used When Calculating Actuarial Equivalence .................10

SUBSTANTIVE ALLEGATIONS ................................................................................13

I.     The Plan.............................................................................................................13

II.    The Plan's JSAs Do Not Satisfy ERISA's Actuarial Equivalence Requirements. ...........15

       A.    Actuarial Assumptions Used to Determine Actuarial Equivalence Must Be Reasonable as of the Date Benefits Are Calculated ...............................................15

       B.    The Plan's Assumptions Do Not Produce Actuarially Equivalent Converted Forms of Benefits in Violation of ERISA...........................................19

III.   Defendants' use of unreasonable assumptions caused Plaintiffs' and the Class's benefits to not be the actuarial equivalent of the single life annuity offered....................20

CLASS ACTION ALLEGATIONS...............................................................................22

FIRST CLAIM FOR RELIEF .......................................................................................25

SECOND CLAIM FOR RELIEF ..................................................................................26

PRAYER FOR RELIEF ................................................................................................29

Plaintiffs, Danny Holloway, James Kohlhagen, Jeffrey Leffin, and Keith Pfister, former employees of Kohler Co. ("Kohler" or the "Company"), bring this class action for violations of the Employee Retirement Income Security Act of 1974 ("ERISA").

**INTRODUCTION**

1. This is a class action against Kohler and the Plan[1] (collectively, "Defendants") concerning the failure to pay benefits under the Kohler Co. Pension Plan (the "Plan") in amounts that satisfy the actuarial equivalence requirements in ERISA.

2. The Plan is a defined benefit pension plan.

3. Under the Plan, participants earn retirement benefits in the form of a single life annuity ("SLA"). An SLA provides participants with monthly payments for the rest of their lives when they retire.

4. The Plan also offers participants several forms of joint and survivor annuities ("JSA.") A JSA is an annuity for the participant's life with a contingent annuity payable to the participant's beneficiary (usually a spouse) for the life of the beneficiary, which is expressed as a percentage of the amount paid during the participant's life. The Plan offers 50%, 75%, and 100% JSAs to married retirees. The 50% JSA pays the surviving spouse one-half of the amount that was paid to the participant before the participant's death; the 75% JSA pays the spouse three quarters; and the 100% JSA pays the same amount.

5. The monthly benefit payable as a JSA, regardless of the percentage, will be less than the amount payable as an SLA because the JSA accounts for the likelihood that the Plan will have to pay benefits for a longer period if a participant dies before the spouse. ERISA limits the extent to which a plan can reduce certain JSA benefits below a participant's SLA benefits. Under

---

[1] The Plan is named as a nominal defendant.

ERISA § 205(d), JSAs with survivorship percentages between 50% through 100% must be at least the actuarial equivalent of the participant's SLA. Two benefit options are actuarially equivalent when they have the same present value, calculated using the same, reasonable actuarial assumptions.

6. Calculating present value requires inputting actuarial assumptions concerning projected mortality and interest rates. Mortality tables for the participant (and, in the case of a JSA, the participant's beneficiary) predict how long the participant and beneficiary will live to account for the likelihood of each future benefit payment being made. Over the last several decades, mortality rates have generally improved with advances in medicine and better collective lifestyle habits. People who retired recently are expected to live longer than those who retired in previous generations. Older mortality tables predict that people near (and after) retirement age will die at a faster rate than current mortality tables. As a result, using an older mortality table decreases the present value of a JSA and — interest rates being equal — the monthly payments retirees receive.

7. The interest rate assumption accounts for the time value of money — the idea that a dollar in hand today is worth more than a dollar paid in a year, or in ten years — and discounts the value of expected future payments to the present. Like mortality, the interest rate affects the calculation. Using lower interest rates — mortality rates being equal — decreases the present value of JSA benefits.

8. To determine the amount of a benefit, mortality and interest rate assumptions, *together*, generate a "conversion factor," which is expressed as a percentage of the benefit being compared. Accordingly, the actuarial assumptions used to generate the conversion factor directly impact the benefit amounts that participants and their beneficiaries receive each month.

9. The conversion factor can also be calculated by dividing the actual amounts payable under a plan. For example, if a JSA benefit pays $900 a month and the SLA pays $1,000 a month, the conversion factor would be .90. If the conversion factor between a JSA and an SLA is lower than the conversion factor that would be generated using reasonable mortality and interest rate assumptions, then the JSA will not be "actuarially equivalent" to the SLA. Accordingly, the conversion factor and the actuarial assumptions used to generate it determine whether two benefit forms are actuarially equivalent.

10. To calculate JSA benefits commencing before January 1, 2021, the Plan used unreasonable assumptions that do not reflect current conditions, and that did not provide an actuarially equivalent benefit, including the 1971 Group Annuity Mortality Table (weighted 90% male and 10% female) and 6% interest.

11. The 1971 Group Annuity Mortality Table ("1971 GAM") overstates mortality rates because it is based on mortality data that is ***more than 50 years old***. When combined with the interest rates that the Plan used before 2021 to calculate JSAs, the 1971 GAM produce conversion factors that that are lower than those generated by reasonable actuarial assumptions and thus do not generate an actuarially equivalent benefit.

12. By using flawed formulas for calculating JSA benefits — based on antiquated, unreasonable actuarial assumptions — Defendants depressed the present value of JSAs, resulting in monthly payments that are ***materially lower*** than they would be if Defendants used conversion factors based on up-to-date, reasonable actuarial assumptions. In sum, Defendants are causing Plaintiffs and Class Members to receive less than they should in pension benefits each month, which will continue to affect them throughout their retirements.

13.     Defendants finally began using reasonable actuarial assumptions for retirees who started receiving benefits on January 1, 2021. For those retirees, Defendants started using (and continue to use) the mortality table and segment interest rates published by the Secretary of the Treasury as more fully described below.

14.     But when changing the assumptions used to calculate JSAs, Defendants did ***not*** correct the under-calculated benefits for retirees who began collecting benefits before January 1, 2021. Accordingly, Plaintiffs bring this action to represent the affected participants and beneficiaries who began collecting JSA benefits from September 19, 2017 through December 31, 2020.

15.     Plaintiffs seek an order from the Court (1) declaring that the conversion factors used to determine JSAs under the Plan produce benefits that are less than the actuarial equivalent of the SLA offered to participants; (2) requiring Defendants to pay all amounts improperly withheld in the past and to be withheld in the future; (3) requiring Defendants to recalculate Plaintiffs' JSAs in a manner consistent with ERISA's actuarial equivalence requirements; (4) requiring Defendants to increase the amounts of Plaintiffs' future benefit payments; and (5) such other relief as the Court determines to be just and equitable.

**JURISDICTION AND VENUE**

16.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA.

17.     This Court has personal jurisdiction over Defendants because they each transact business in, or reside in, and have significant contacts with this District, and because ERISA provides for nationwide service of process.  Defendant Kohler is headquartered in this District.

18. Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all the violations of ERISA occurred in this District and Defendants may be found in this District. Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Kohler does business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

**PARTIES**

**I. Plaintiffs**

19. Plaintiff Danny Holloway is a Plan participant who worked for Kohler for over 40 years. Mr. Holloway began receiving his Plan benefits as a 50% JSA, with his spouse as the beneficiary, in September 2019. His benefit amount was calculated using the 1971 Group Annuity Mortality Table and 6% interest.

20. Plaintiff James Kohlhagen is a Plan participant who worked for Kohler for over 42 years. Mr. Kohlhagen began receiving his Plan benefits as a 100% JSA, with his spouse as the beneficiary, in October 2020. His benefit amount was calculated using the 1971 Group Annuity Mortality Table and 6% interest.

21. Plaintiff Jeffrey Leffin is a Plan participant who worked for Kohler for over 43 years. Mr. Leffin began receiving his Plan benefits as a 50% JSA, with his spouse as the beneficiary, in August 2020. His benefit amount was calculated using the 1971 Group Annuity Mortality Table and 6% interest.

22. Plaintiff Keith Pfister is a Plan participant who worked for Kohler for over 41 years. Mr. Pfister began receiving his Plan benefits as a 75% JSA, with his spouse as the beneficiary, in July 2020. His benefit amount was calculated using the 1971 Group Annuity Mortality Table and 6% interest.

## II. Defendants

23. Kohler is a private manufacturing company based in Kohler, Wisconsin. The Company is known for its plumbing products but also manufactures furniture, cabinetry, tile, engines, and generators.

24. Kohler sponsors the Plan.

25. According to the Plan, "[t]he Company shall be the 'administrator' of the Plan within the meaning of section 3(16)(A) of ERISA, a fiduciary with respect to the Plan within the meaning of sections 3(21)(A)(i) and (iii) of ERISA, and the named fiduciary under section 402 of ERISA. It shall also be the Plan Administrator for purposes of the Plan." Plan § 9.1.

### APPLICABLE ERISA REQUIREMENTS

## I. Pension Benefit Options Must Be Actuarially Equivalent

26. ERISA requires that defined benefit plans pay married participants and their beneficiaries in the form of a qualified JSA (a "QJSA") unless the participant, with the consent of his or her spouse, elects an alternative form of payment. A QJSA must be the default benefit for employees who are married. ERISA §§ 205(a) and (b), 29 U.S.C. § 1055(a) and (b).

27. ERISA defines a QJSA as an annuity for the life of the participant with a survivor benefit for the life of the spouse that is not less than 50%, and not greater than 100% of the annuity payable during the joint lives of the participant and the spouse. ERISA § 205(d)(1), 29 U.S.C. § 1055(d)(1). A QJSA includes "any annuity in a form having the effect of an annuity" described in ERISA § 205(d)(1). *Id*. Accordingly, a plan can offer multiple QJSA options; that is, JSAs that pay survivor benefits between 50% to 100%. *Id*. A QJSA must be actuarially equivalent to the SLA that participants are offered under their plan. *Id*.

28. Pension plans must also offer participants at least one other form of JSA, known as a qualified optional survivor annuity ("QOSA"). *See* ERISA § 205(d)(2), 29 U.S.C. § 1055(d)(2).

A QOSA is similar to a QJSA, except that the QOSA's survivor annuity percentage must be: (a) greater than 75% if the QJSA's survivor annuity percentage is less than 75%; and (b) 50% if the QJSA's survivor annuity percentage is greater than 75%. The definition of a QOSA includes "any annuity in a form having the effect of an annuity" described in ERISA § 205(d)(2). ERISA requires that QOSAs be actuarially equivalent to an SLA. *See* ERISA § 205(d)(2)(A)(ii), 29 U.S.C. § 1055(d)(2)(A)(ii).

29.     ERISA also requires that defined benefit plans provide a qualified pre-retirement survivor annuity ("QPSA"). ERISA § 205(a)(2), 29 U.S.C. § 1055(a)(2). A QPSA is an annuity for the life of the vested participant's surviving spouse (*i.e.*, a beneficiary) if the participant dies before reaching the plan's normal retirement age. ERISA § 205(e), 29 U.S.C. § 1055(e). A QPSA must be actuarially equivalent to the benefit the surviving spouse would have received under the plan's QJSA. *See* ERISA § 205(e)(1)(A), 29 U.S.C. § 1055(e)(1)(A).

30.     Reorganization Plan No. 4 of 1978 transferred authority to the Secretary of the Treasury to issue regulations for several provisions of ERISA, including § 205, which concerns alternative forms of benefits. *See* 92 Stat. 3790 (Oct. 17, 1978), codified at 29 U.S.C. § 1001.

31.     The Treasury regulations for the Internal Revenue Code (the "Tax Code") provision corresponding to ERISA § 205 (26 U.S.C. § 401(a)(11)) provide that a QJSA "must be at least the actuarial equivalent of the normal form of life annuity or, if greater, of any optional form of life annuity offered under the plan." 26 C.F.R. § 1.401(a)-11(b)(2). Indeed, a QJSA "must be as least as valuable as any other optional form of benefit under the plan at the same time." 26 C.F.R. § 1.401(a)-20 Q&A 16. Accordingly, if a plan offers other benefit options that are more valuable than the SLA, the QJSA must be at least as valuable as the most valuable form of those benefit

9

options. The regulations regarding QJSAs apply "when the participant attains the earliest retirement age under the plan."  26 C.F.R. § 1.401(a)-20 Q&A 17.

32.     ERISA does not require that pension plans offer lump sum distributions of vested benefits to retirees upon their retirement.  *See* ERISA § 205(g), 29 U.S.C. § 1055(g).  But if they do, ERISA § 205(g)(3), 29 U.S.C. § 1055(g)(3), requires that the present value of the lump sum be at least equal to the present value of the participant's benefits determined using the applicable mortality table (the "Treasury Mortality Table")[2] and applicable interest rates (the "Treasury Interest Rate")[3] (collectively, the "Treasury Assumptions"). The Treasury Assumptions are set by the Secretary of the Treasury (the "Secretary") pursuant to IRC §§ 417(e) and 430(h) and are based on current market rates and mortality assumptions.  *See* 29 U.S.C. § 1055(g)(3)(B); 29 U.S.C. § 1083(h), 26 U.S.C. §§ 417(e) and 430(h).

33.     ERISA § 203(a), 29 U.S.C. § 1053(a), provides that an employee's right to the vested portion of his or her normal retirement benefit is non-forfeitable.

34.     The Treasury regulation for the Tax Code provision corresponding to ERISA § 203 (26 U.S.C. § 411), states that "adjustments in excess of reasonable actuarial reductions, can result in rights being forfeitable."  26 C.F.R. § 1.411(a)-4(a).

## II.     Reasonable Factors Must Be Used When Calculating Actuarial Equivalence

35.     "Two modes of payment are actuarially equivalent when ***their present values are equal*** under a given set of assumptions."  *Stephens v. US Airways Group, Inc.*, 644 F.3d 437, 440 (D.C. Cir. 2011) (emphasis added) (citing Jeff L. Schwartzmann & Ralph Garfield, Education and

---

[2] *See* 26 C.F.R. § 1.430(h)(2)-1.
[3] *See* 26 C.F.R. § 1.430(h)(3)-1.

Examination Comm. of the Society of Actuaries, Actuarially Equivalent Benefits 1, EA1-24-91 (1991) ("Schwartzmann & Garfield").[4]

36. Under ERISA, "present value" must "reflect anticipated events." Present value adjustments "shall conform to such regulations as the Secretary of the Treasury may prescribe." ERISA § 3(27), 29 U.S.C. § 1002(27). The Secretary has prescribed several Regulations describing how present value should reasonably reflect anticipated events, including:

37. The Regulation concerning QJSAs provides that "[e]quivalence may be determined, on the basis of consistently applied *reasonable actuarial factors*, for each participant or for all participants or reasonable groupings of participants." 26 C.F.R. § 401(a)-11(b)(2) (emphasis added).

38. A plan must determine optional benefits using "a single set of *interest and mortality assumptions that are reasonable* . . . ." 26 C.F.R. § 1.417(a)(3)-1(c)(2)(iv) (emphasis added).

39. The term actuarial present value means "actuarial present value (within the meaning of § 1.401(a)(4)-12) determined using *reasonable actuarial assumptions*." 26 C.F.R. § 1.411(d)-3(g)(1) (emphasis added).

40. With respect to benefits under a lump sum-based formula, any optional form of benefit must be "at least the actuarial equivalent, using *reasonable actuarial assumptions* . . . ." 26 C.F.R. § 1.411(a)(13)-1(b)(3) (emphasis added).

41. The Regulations also rely on the standards of the Society of Actuaries (the "SOA") for determining the present value of pension liabilities. *See, e.g.,* 26 C.F.R. § 1.430(h)(3)-1(a)(2)(C); IRS Notices: 2008-85, 2013-49, 2015-53, 2016-50, 2018-02; 82 Fed. Reg.

---

[4] According to Merriam Webster: "Equivalent" means "equal." *See* https://www.merriam-webster.com/dictionary/equivalent. "Equal" means the "same." https://www.merriam-webster.com/dictionary/equal

46388-01 (Oct. 5, 2017) ("Mortality Tables for Determining Present Value Under Defined Benefit Plans"), 72 Fed. Reg. 4955-02 (Feb. 2, 2007) ("Updated Mortality Tables for Determining Current Liability").

42.     Like the Regulations and ERISA's definition of "present value," the Actuarial Standards of Practice ("ASOPs") issued by the Actuarial Standards Board ("ASB")[5] of the American Academy of Actuaries (the "Academy"), require actuaries to use "reasonable assumptions."  *See* ASOP No. 27, § 3.6 ("each economic assumption used by an actuary should be reasonable"); *see also* ASOP No. 35, § 3.3.5 ("Each demographic assumption selected by the actuary should be reasonable").

43.     Courts interpreting ERISA's actuarial equivalence requirements when calculating benefits have stated that "***special attention must be paid to the actuarial assumptions underlying the computations***." *Pizza Pro Equip. Leasing v. Comm. of Revenue*, 147 T.C. 394, 411 (emphasis added), *aff'd*, 719 Fed. Appx. 540 (8th Cir. 2018).  As the Ninth Circuit stated in *McDaniel v. Chevron Corp.*, 203 F.3d 1099, 1110 (9th Cir. 2000):

> The most important consideration in preparing and selecting a mortality table to be used in calculating pension benefits is whether the population from whom the mortality experience is developed is sufficiently broad and has characteristics that are typical of the plan's participants.

44.     The court explained in *Dooley v. Am. Airlines, Inc.* that each assumption used in an actuarial equivalence determination must be reasonable:

> When the terms of a plan subject to ERISA provide that plan participants may opt to receive their accrued pension benefits in forms other than as a single life annuity, the amount payable to the plan participant under such circumstances must be "actuarially equivalent" to the participant's accrued

---

[5] The ASB is an independent entity created by the Academy in 1988 and the single board that promulgates standards of practice for the entire actuarial profession in the United States.  The ASB was given sole authority to develop, obtain comment upon, revise, and adopt standards of practice for the actuarial profession.

benefits when calculated as a single life annuity. The term actuarially equivalent means equal in value to the present value of normal retirement benefits, ***determined on the basis of actuarial assumptions with respect to mortality and interest which are reasonable in the aggregate***.

*Dooley v. Am. Airlines, Inc.*, 1993 WL 460849, at * 10 (N.D. Ill. Nov. 4, 1993) (emphasis added); *see also Dooley v. Am. Airlines, Inc.*, 797 F.2d 1447, 1453 (7th Cir. 1986) (citing expert testimony that "actuarial equivalence must be determined on the basis of reasonable actuarial assumptions.").

45.     Actuarial equivalence should be "cost-neutral," meaning that neither the plan nor participants should be better or worse off if participants select an SLA or a JSA.  *See Bird v. Eastman Kodak Co.*, 390 F.Supp.2d 1117, 1118–19 (M.D. Fla. 2005).

46.     "Periodically, the assumptions used [for actuarial equivalence] must be reviewed and modified so as to insure that they continue to fairly assess the cost of the optional basis of payment."  Schwartzmann & Garfield at 11; *see also Smith v. Rockwell Automation*, No. 19-CV-0505, 2020 WL 620221, * 7 (E.D. Wisc. Jan. 10, 2020) ("plans must use the kind of actuarial assumptions that a reasonable actuary would use at the time of the benefit determination.").

<strong>SUBSTANTIVE ALLEGATIONS</strong>

**I.      The Plan**

47.     Kohler established the Plan effective January 1, 1975. The current version of the Plan is the result of the merger of various plans, including Kohler Factory Hourly Employees Pension Plan; Kohler Co. Spartanburg Factory Hourly Employees Pension Plan; Kohler Co. Brownwood Factory Hourly Employees Pension Plan; Kohler Co. Retirement Plan for Sterling Hourly Employees; and Baker Knapp & Tubbs, Inc. Hourly Pension Plan.

48.     The Plan is an "employee pension benefit plan" within the meaning of ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A), and a "defined benefit plan" within the meaning of ERISA § 3(35), 29 U.S.C. § 1002(35).

49.     The benefits of participants are determined in accordance with the provisions of the Plan including its supplements and appendices.  The Plan contains six "supplements": (1) Supplement A - Administrative Associates; (2) Supplement B - Kohler, WI Factory Hourly Associates; (3) Supplement C - Spartanburg Factory Hourly Associates; (4) Supplement D - Brownwood Factory Hourly Associates; (5) Supplement E - Sterling Hourly Associates; and (6) Supplement F - Baker Knapp & Tubbs, Inc. Hourly Associates.

50.     The Plan and its supplements and appendices are intended to be a "single plan" as that term is defined in section 1.414(1)-1(b)(1) of the Treasury Regulations.  Plan § 9.10.

51.     The Normal Form of Payment for an unmarried participant is an SLA. Plan § 5.6(a).

52.     For a married participant, the Normal Form of Payment is a 50% JSA with the participant's spouse as the beneficiary, "unless the Participant elects otherwise as provided in this section." *Id*.

53.     The Plan offers several "Optional Forms of Payment" to married participants, including a 75% JSA with the participant's spouse as the beneficiary, a 100% JSA with the participant's spouse as the beneficiary, an SLA and a ten-year certain and life annuity ("10 CLA").

54.     The Plan does not require a married participant to obtain his her spouse's consent to select the 50%, 75% or 100% JSA options. Plan § 5.6(b) (emphasis added).  The Plan does, however, require spousal consent if a married participant selects an SLA, a 10 CLA or a JSA under which the participant's spouse is not the beneficiary.  *Id*.

55.     The Plan offers a Preretirement Survivor Annuity payable to a married participant's spouse if the participant dies before starting to receive retirement benefits under the Plan. Plan at § 5.5.  "Payment of the Preretirement Survivor Annuity shall be equal to the amounts which would

be payable as a survivor annuity under the Qualified Joint and Survivor Annuity under the Plan . . . .” *Id*. at § 5.5(c).

56. The Plan used the 1971 GAM and a 6% interest rate to calculate JSAs commencing before January 1, 2021.[6]

57. Under § 10.1 of the Plan, the Company “reserve[s] the right to amend, modify, or terminate the Plan at any time.” Plan § 10.1. “***The Company may make any modifications or amendments to the Plan, and retroactively if necessary or appropriate***” to comply with the “provisions of the Code or ERISA, or the regulations issued thereunder.” *Id*. (Emphasis added.)

## II. The Plan’s JSAs Do Not Satisfy ERISA’s Actuarial Equivalence Requirements.

58. Throughout the relevant period, Kohler calculated JSAs for married participants using actuarial assumptions that did not produce benefits that satisfied ERISA’s actuarial equivalence requirements.

### A. Actuarial Assumptions Used to Determine Actuarial Equivalence Must Be Reasonable as of the Date Benefits Are Calculated

59. As discussed above, to compare the present values of two benefit options offered to a plan participant at the time she begins collecting benefits, it is necessary to determine the present values of the ***aggregate*** (*i.e.,* total) future benefits the participant (and, if applicable, the beneficiary) is expected to receive under each form using actuarial assumptions that are reasonable as of that date. There are two main components of these present value calculations: (1) an interest rate and (2) the mortality table applied to participants and beneficiaries.

---

[6] The Plan’s use of the 1971 GAM and a 6% interest rate was subject to certain exceptions, including for participants that earned benefits under the Administrative Associates or Sterling Hourly supplements that worked in Morgantown and certain participants that earned benefits under the Plan supplement for former employees of Baker, Knapp & Tubbs, Inc.

60.     An interest rate is used to determine the present value of each future payment.  This is based on the time value of money, meaning that money available now is worth more than the same amount in the future due to the ability to earn investment returns.  The rate is often called a "discount rate" because it discounts the value of a future payment.  *Berger v. Xerox Corp. Retirement Income Guar. Plan*, 338 F.3d 755, 759 (7th Cir. 2003).  ("A discount rate is simply an interest rate used to shrink a future value to its present equivalent.").

61.     The interest rate used by a defined benefit plan to calculate present value must be reasonable based on prevailing market conditions, which "reflect anticipated events." ERISA § 3(27, 29 U.S.C. § 1002(27).  The interest rate may be broken into segments of short-term, medium-term and long-term expectations pertaining to each future payment. *See, e.g.*, ERISA §§ 205(g)(3)(B)(iii) and 303(h)(2), 29 U.S.C. §§ 1055(g)(3)(B)(iii) and 1083(h)(2).

62.     As alleged above, under § 3.6 of ASOP No. 27,[7] "each economic assumption used by an actuary should be reasonable."[8] An assumption is deemed "reasonable" if it "takes into account historical and current economic data that is relevant as of the **measurement date**," and "reflects the actuary's estimate of future experience." *See* ASOP No. 27, § 3.6 (emphasis in original).  The Treasury Interest Rates are reasonable because they are updated to reflect current economic conditions.

63.     A mortality table is a series of rates which predict how many people at a given age will die before attaining the next higher age.

---

[7] Courts look to professional actuarial standards as part of this analysis. *See, e.g., Stephens*, 644 F.3d at 440 (citing Schwartzmann & Garfield); *see also McDaniel*, 203 F.3d at 1110 (citing American Academy of Actuaries' publication).

[8] Available at: https://www.actuarialstandardsboard.org/asops/selection-economic-assumptions-measuring-pension-obligations/

64.	More recent mortality tables are "two-dimensional" in that the rates are based not only on the age of the individual but the year of birth.

65.	The SOA, an independent actuarial group, publishes the mortality tables that are the most widely used by defined benefit plans when doing these calculations. The SOA published mortality tables in 1971 (the "1971 GAM"), 1976 (the "UP 1984"), 1983 (the "1983 GAM"), 1994 (the "1994 GAR"), 2000 (the "RP-2000"), 2014 ("RP-2014"), and 2019 (the "Pri-2012") to account for changes to the population's mortality experience.

66.	Since at least the 1980s, the life expectancies in mortality tables have been on an upward trend as shown below:



Source: Aon Hewitt, *Society of Actuaries Finalizes New Mortality Assumptions: The Financial and Strategic Implication for Pension Plan Sponsors* (November 2014), at 1. According to this paper, there have been "increasing life expectancies over time" and just moving from the RP-2000 mortality table to the 2014 table would substantially increase projected morality and, therefore, increase pension liabilities by 7%.

67. Under § 3.5.3 of ASOP 35, mortality tables must be adjusted on an ongoing basis to reflect improvements in mortality.[9]

68. Accordingly, in the years between the publication of a new mortality table, mortality rates are "projected" to future years to account for expected improvements in mortality.[10] For example, in 2017, the Treasury Mortality Table was the RP-2000 mortality table adjusted for mortality improvement using Projection Scale AA to reflect the impact of expected improvements in mortality since publication of the table. IRS Notice 2016-50.[11] In 2018, the Treasury Mortality Table was the RP-2014 mortality table projected to account for additional improvement in mortality rates that have occurred since 2014. IRS Notice 2017-60.[12] The Treasury Mortality Table is now the Pri-2012.

69. For purposes of the present value analysis under ERISA, the mortality table must be updated and reasonable "to reflect anticipated events." 29 U.S.C § 1002(27). The Treasury Mortality Tables are updated to reflect recent mortality data from participants in private pension plans. *See* 26 C.F.R. § 1.417(a)(3)-1(c)(2)(iv). Accordingly, the Treasury Assumptions are reasonable.

70. Using a reasonable interest rate and mortality table, the present values of the SLA and the other forms of benefit can be compared to determine whether those forms of benefit are actuarially equivalent to the SLA. Pension plans must use reasonable interest rates and mortality

---

[9] *See* http://www.actuarialstandardsboard.org/asops/selection-of-demographic-and-other-noneconomic-assumptions-for-measuring-pension-obligations/#353-mortality-and-mortality-improvement

[10] Life expectancies with a projection scale assume a generational projection of future mortality improvements (i.e., life expectancies increase with year of birth).

[11] *See* https://www.irs.gov/pub/irs-drop/n-16-50.pdf.

[12] *See* https://www.irs.gov/pub/irs-drop/n-17-60.pdf.

tables to evaluate whether the present values of benefit options produce actuarially equivalent benefits for participants and beneficiaries.

**B.   The Plan's Assumptions Do Not Produce Actuarially Equivalent Converted Forms of Benefits in Violation of ERISA.**

71.     The Plan's assumptions does ***not*** result in JSA benefits that are actuarially equivalent to the SLA offered to participants when they commence benefits under the Plan because the present values of the of these benefits are lower than the present values of the SLAs.

72.     Defendants did not use reasonable assumptions in the formula for calculating JSAs for married participants because the 1971 GAM does not "reflect anticipated events" (i.e., the anticipated mortality rates of participants).

73.     The 1971 GAM was published in 1971 using mortality data from the 1960s for participants in group annuity plans. Mortality rates have significantly declined since the 1960s, resulting in a greater overall life expectancy for retiring participants in pension plans. Accordingly, the 1971 GAM that the Plan uses was not developed from a population that "has characteristics that are typical of the plan's participants." *McDaniel*, 203 F.3d at 1110.

74.     Because the 1971 GAM mortality rates, their use results in lower conversion factors than those produced using a reasonable mortality assumption.

75.     The Plan's assumptions used to calculate JSA benefits had not been changed in many years, prior to being amended as of January 1, 2021.  These assumptions produce benefits that are not actuarially equivalent to the amount of the SLA benefit.  This is true for each participant that selects a QJSA, QOSA or QPSA under the Plan, regardless of the participant's age or when benefits commenced.

**III.** **Defendants' use of unreasonable assumptions caused Plaintiffs' and the Class's benefits to not be the actuarial equivalent of the single life annuity offered.**

76. Plaintiffs' and the Class's benefits are ***materially lower*** (i.e., worse for participants) than those generated using reasonable actuarial assumptions such as the applicable Treasury Assumptions.

77. While the amount of the loss suffered will vary depending on the ages of the participant and beneficiary at the time of retirement, and on, if relevant, the percentage of the JSA, all participants receiving JSA benefits under the Plan are not receiving actuarially equivalent benefits because the present values of those benefits are not equal to the present values of the SLAs they could have taken at the times they retired.

78. By applying unreasonable, antiquated actuarial assumptions to calculate participants' JSA benefits, Defendants are causing participants to receive lower monthly payments than they should be receiving had reasonable formulae.

79. "ERISA did not leave plans free to choose their own methodology for determining the actuarial equivalent of the accrued benefit . . . 'If plans were free to determine their own assumptions and methodology, they could effectively eviscerate the protections provided by ERISA's requirement of actuarial equivalence.'" *Laurent v. PriceWaterhouseCoopers LLP*, 794 F.3d 272 (2d Cir. 2015) *quoting*, *Esden v. Bank of Boston*, 229 F.3d 154, 164 (2d Cir. 2000). The Plan's formulae for determining JSA benefits do ***not*** reflect "characteristics that are typical of the plan's participants." *McDaniel*, 203 F.3d at 1110.

80. During the relevant period, Defendants used antiquated and unreasonable actuarial assumptions, to undervalue JSA benefits. Had the Plan used reasonable actuarial assumptions — such as the Treasury Assumptions  — Plaintiffs and the Class would have received, and would

continue to receive, actuarially equivalent benefits that are greater than the benefits they currently receive.

81. Discovery and expert analyses will likely show that Defendants' use of unreasonable assumptions to generate QJSA, QOSA and QPSAs deprive retirees and their spouses of millions of dollars.

82. Plaintiff Holloway started receiving benefits at age 66 and his wife was age 68. He selected a 50% JSA which pays $1,123.28 per month and was calculated using 1971 Group Annuity Mortality Table and 6% interest rate. However, if his benefits were calculated using the Treasury Assumptions, his monthly benefit would increase to $1,186.39 — an increase of $63.11 per month or 5.62%. Through their use of unreasonable assumptions to determine JSA benefits, *Defendants have reduced the present value of Plaintiff Holloway's benefits under the Plan by approximately $10,531*.

83. Plaintiff Kohlhagen started receiving benefits at age 62 and his wife was age 66. He selected a 100% JSA which pays $1,486.26 per month and was calculated using 1971 Group Annuity Mortality Table and 6% interest rate. However, if his benefits were calculated using the Treasury Assumptions, his monthly benefit would increase to $1,594.66 — an increase of $108.40 per month or 7.29%. Through their use of unreasonable assumptions to determine JSA benefits, *Defendants have reduced the present value of Plaintiff Kohlhagen's benefit under the Plan by approximately $23,354*.

84. Plaintiff Leffin started receiving benefits at age 62 and his wife was age 60. He selected a 50% JSA which pays $1,577.70 per month and was calculated using 1971 Group Annuity Mortality Table and 6% interest rate. However, if his benefits were calculated using the Treasury Assumptions, his monthly benefit would increase to $1,654.12 — an increase of $76.42

per month or 4.8%. Through their use of unreasonable assumptions to determine JSA benefits, *Defendants have reduced the present value of Plaintiff Leffin's benefit under the Plan by approximately $15,864*.

85. Plaintiff Pfister started receiving benefits at age 62 and his wife was age 62. He selected a 75% JSA which pays $1,449.42 per month and was calculated using 1971 Group Annuity Mortality Table and 6% interest rate. However, if his benefits were calculated using the Treasury Assumptions, his monthly benefit would increase to $1,543.26 — an increase of $93.84 per month or 6.47%. Through their use of unreasonable assumptions to determine JSA benefits, *Defendants have reduced the present value of Plaintiff Pfister's benefit under the Plan by approximately $20,393*.

86. Because their benefits were calculated using the Plan's unreasonable assumptions, each of the Plaintiffs have been harmed. They are each receiving less each month than they would have received if the Plan used reasonable, up-to-date actuarial assumptions, like ERISA requires. Plaintiffs, along with each other class member, has been substantially damaged as a result of receiving benefits below an actuarially equivalent amount in violation of ERISA.

87. In short, Defendants failed to provide JSA benefits that were actuarially equivalent to the SLA that participants were entitled to receive when they retired as required by ERISA. By using unreasonable formulas based on antiquated actuarial assumptions, Defendants have materially reduced the monthly benefits that participants and beneficiaries under the Plan receive in comparison to the monthly benefits they would receive if Defendants used updated, reasonable actuarial assumptions.

## CLASS ACTION ALLEGATIONS

88. Plaintiffs bring this class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of himself and the class (the "Class") defined as follows:

All participants and beneficiaries entitled to benefits under the Kohler Co. Pension Plan who began receiving a (1) joint and survivor annuity, (2) qualified optional survivor annuity, or (3) qualified preretirement survivor annuity, on or after September 19, 2017 but before January 1, 2021, whose benefits had a present value that was less than the present value of the SLA they were offered using the applicable Treasury Assumptions as of each participant's Benefit Commencement Date. Excluded from the Class are Defendants and any individuals who are subsequently to be determined to be fiduciaries of the Plan.

89.     The members of the Class are so numerous that joinder of all members is impractical.  Upon information and belief, the Class includes thousands of persons. According to the Plan's 2020 Form 5500, there were 7,965 active participants in the entire Plan. In the Plan's Form 5500, the Plan's actuary assumed 90% of male participants are married and 50% of female participants are married.

90.     Plaintiffs' claims are typical of the claims of the members of the Class because Plaintiffs' claims, and the claims of all Class members, arise out of the same policies and practices as alleged herein, and all members of the Class are similarly affected by Defendants' wrongful conduct.

91.     There are questions of law and fact common to the Class and these questions predominate over questions affecting only individual Class members.  Common legal and factual questions include, but are not limited to:

      A.    Whether the assumptions used by the Plan for participants who commenced benefits before January 1, 2021 provided QJSA, QOSA and QPSAs to married participants that are actuarially equivalent to the SLA offered;

      B.    Whether these assumptions for calculating JSAs are reasonable;

      C.    Whether Plaintiffs and Class members should have their benefits recalculated to conform with ERISA's actuarial equivalence requirements; and

D.      Whether Plaintiffs and Class members should receive payments to compensate them for past and future benefit payments that did not and will not satisfy ERISA's actuarial equivalence requirements.

92.     Plaintiffs will fairly and adequately represent the Class and has retained counsel experienced and competent in the prosecution of ERISA class actions.  Plaintiffs have no interests antagonistic to those of other members of the Class.  They are each committed to the vigorous prosecution of this action and anticipate no difficulty in the management of this litigation as a class action.

93.     This action may be properly certified under either subsection of Federal Rule of Civil Procedure 23(b)(1).  Class action status is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants.  Class action status also is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

94.     In the alternative, certification under Rule 23(b)(2) is warranted because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

95.     If the Class is not certified under Rule 23(b)(1) or (b)(2), then certification under Rule 23(b)(3) is appropriate because the questions of law or fact common to the members of the

Class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

**FIRST CLAIM FOR RELIEF**
**Declaratory and Equitable Relief**
**( ERISA §§ 205, 502(a)(3) [codified at 29 U.S.C. §§ 1055, 1132(a)(3))**

96. Plaintiffs re-allege and incorporate by reference all prior allegations in this Amended Complaint.

97. Defendants have improperly reduced QJSA, QOSA, and QPSA benefits for participants and beneficiaries of the Plan below the amounts that they would receive if those benefits were actuarially equivalent to an SLA, violating ERISA § 205, 29 U.S.C. § 1055.

98. ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action to: "(A) enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

99. Pursuant to this provision, 28 U.S.C. §§ 2201 and 2202, and Federal Rule of Civil Procedure 57, Plaintiffs seek declaratory relief, determining that the methodologies used by Defendants for calculating the actuarial equivalence of QJSAs, QOSAs, and QPSAs violate ERISA because they do not provide an actuarially equivalent benefit, as required by ERISA § 205(d), 29 U.S.C. § 1055(d).

100. Plaintiffs seek an order from the Court providing a full range of equitable relief, including but not limited to:

(a) re-calculation, correction, and payment of QJSA, QOSA, and QPSA benefits previously paid under the Plan in accordance with ERISA;

(b) an "accounting" of all prior benefits and payments;

25

(c) an equitable surcharge;

(d) disgorgement of amounts wrongfully withheld;

(e) disgorgement of profits earned on amounts wrongfully withheld;

(f) a constructive trust;

(g) an equitable lien;

(h) an injunction against further violations; and

(i) other relief the Court deems just and proper.

**SECOND CLAIM FOR RELIEF**
**Breach of Fiduciary Duty**
**(ERISA §§ 404 and 502(a)(3), 29 U.S.C. §§ 1104 and 1132(a)(3))**

101. Plaintiffs re-allege and incorporate by reference all prior allegations in this Complaint.

102. ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other persons who in fact perform fiduciary functions. Thus, a person is a fiduciary to the extent that person "(i) exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) has any discretionary authority or discretionary responsibility in the administration of such plan." ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). This is a functional test. As such, neither "named fiduciary" status, nor formal delegation is required for a finding of fiduciary status, and contractual agreements, such as the governing Plan documents, cannot override a finding of fiduciary status when the statutory test is met.

26

103. Kohler is a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because it was the "Administrator" of the Plan and because it exercised discretionary authority or control with respect to the management of the Plan, and/or exercised authority or control over management or disposition of the Plan's assets, and/or has discretionary authority or discretionary responsibility in the administration of the Plan, including, but not limited to, its duty to appoint and monitor members of the Committee.

104. ERISA charges fiduciaries with among the highest duties known to law. These duties are set down in ERISA § 404, 29 U.S.C. § 1104, which states, in relevant part, the following:

(a) Prudent man standard of care

(1) . . . a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—

(A) for the exclusive purpose of:

(i) providing benefits to participants and their beneficiaries; and

(ii) defraying reasonable expenses of administering the plan;

(B) with the care, skill, *prudence*, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims; . . . ; and

(D) in accordance with the documents and instruments governing the plan *insofar as such documents and instruments are consistent with the provisions of this subchapter and subchapter III. . . .*

ERISA § 404(a), 29 U.S.C. § 1104(a) (emphasis added).

105. As alleged above, under the terms of the Plan document, Kohler had the sole power, duty, and responsibility to direct the administration of the Plan in accordance with the requirements of the Tax Code and ERISA.

106. The Plan's terms are not consistent with ERISA because the Plan uses unreasonable formulae to calculate QJSA, QOSA and QPSA benefits that do not provide actuarially equivalent

benefits in violation of ERISA's actuarial equivalence requirements. As a result, participants and beneficiaries do not receive the actuarially equivalent benefits ERISA require and lose vested benefits in violation of ERISA.

107. Here, Defendants breached their fiduciary duties by, among other reasons, directing the administration of the Plan in violation of ERISA.

108. As a direct and proximate result of the Defendants' fiduciary breaches, participants in the Plan have lost, and are continuing to lose, millions of dollars in vested accrued pension benefits.

109. ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action to: "(A) enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

110. Pursuant to this provision, 28 U.S.C. §§ 2201 and 2202, and Federal Rule of Civil Procedure 57, Plaintiffs seek declaratory relief, determining that the Plan's established methodologies for calculating QJSA, QOSA and QPSA do not provide actuarially equivalent benefits because they do not provide benefits with an equal present value to the SLA as required under ERISA.

111. Plaintiffs further seek orders from the Court providing a full range of equitable relief including but not limited to:

(a) re-calculation, correction, and payment of actuarially equivalent QJSA, QOSA and QPSA previously paid under the Plan in accordance with ERISA;

(b) an "accounting" of all prior benefits and payments;

(c) an equitable surcharge;

(d)　disgorgement of amounts wrongfully withheld;

(e)　disgorgement of profits earned on amounts wrongfully withheld;

(f)　a constructive trust;

(g)　an equitable lien;

(h)　an injunction against further violations; and

(i)　other relief the Court deems just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that judgment be entered against Defendants on all claims and requests that the Court award the following relief:

A.　Certify this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.　Declare that the Plan has failed to properly calculate and pay benefits that are actuarially equivalent to the SLA, in violation of ERISA;

C.　Order Defendants to correct and recalculate benefits that have been paid under the Plan;

D.　Order Defendants to provide an "accounting" of all prior payments benefits under the Plan to determine the proper amounts that should have been paid;

E.　Order Defendants to pay all benefits improperly withheld, including under the theories of equitable surcharge and disgorgement;

F.　Order Defendants to disgorge any profits earned on amounts improperly withheld;

G.　Impose a constructive trust;

H.　Impose an equitable lien;

I.　Order Defendants to pay future benefits in accordance with ERISA's actuarial equivalence requirements;

J.     Award, declare, or otherwise provide Plaintiff and the Class with all relief available under ERISA § 502(a), 29 U.S.C. § 1132(a), or any other applicable law, that the Court deems proper;

K.     Award to Plaintiffs' counsel attorneys' fees and expenses as provided by the common fund doctrine, ERISA § 502(g), 29 U.S.C. § 1132(g), and/or other applicable doctrine; and

L.     Any other relief or remedy the Court determines is just and proper.

Dated:  January 16, 2024                            Respectfully submitted,

*/s Christopher M. Barrett*
IZARD, KINDALL & RAABE LLP
Robert A. Izard
Christopher M. Barrett
29 South Main Street, Suite 305
West Hartford, CT 06107
Tel: (860) 493-6292
Fax: (860) 493-6290
Email: rizard@ikrlaw.com
Email: cbarrett@ikrlaw.com

MOTLEY RICE LLC
Douglas P. Needham
One Corporate Center
20 Church Street, 17th Floor
Hartford, CT 06103
Telephone: 860-218-2720
dneedham@motleyrice.com

SIRI & GLIMSTAD LLP
Oren Faircloth
Lisa R. Considine
745 Fifth Avenue, Suite 500
New York, New York 10151
Tel: (212) 532-1091 Fax: (646) 417-5967
ofaircloth@sirillp.com
lconsidine@sirillp.com